Peter W. HIRSCH, Regional Director of the Fourth Region of the National Labor Relations Board, For and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

PICK–MT. LAUREL CORPORATION, Respondent.

Civ. A. No. 77–0891.

United States District Court, D. New Jersey.

Sept. 16, 1977.

Harold Bernard, Jr., Mariann E. Schick, Region 4, N.L.R.B., Philadelphia, Pa., for petitioner.

Howard L. Kastel, Alan S. Rutkoff, Altheimer & Gray, Chicago, Ill., Frederick J. Rohloff, Archer, Greiner & Read, Haddonfield, N.J., for respondent.

OPINION

GERRY, District Judge.

The petitioner, Peter W. Hirsch, Regional Director of the Fourth Region of the National Labor Relations Board [NLRB], seeks a temporary injunction pursuant to section 10(j) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(j) [Act][1] to enjoin respondent Pick-Mt. Laurel Corporation from refusing to bargain with Local 170, Bartenders, Hotel, Motel and Restaurant Employees Union, AFL–CIO [Local 170], pending final disposition by the NLRB of underlying unfair labor practice charges under sections 8(a)(1) and 8(a)(5) of the Act.[2]

Pursuant to an order to show cause, three days of testimony were heard by the court; the parties have submitted proposed findings of fact, conclusions of law, and comprehensive briefs. The following constitute the court's findings of fact and conclusions of law.

I. FINDINGS OF FACT

1. Respondent Pick-Mt. Laurel Corp. is a New Jersey corporation which on February 9, 1977 became owner and operator of a hotel, restaurant and bar facility in Mt. Laurel, New Jersey. Respondent was the successor to the MLH Development Co., d/b/a Hotel Mt. Laurel Hilton, which had continuously operated the facility since June 5, 1975.

2. Local 170, an unincorporated association, is an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

3. Local 170, alleging the existence of a collective bargaining agreement with the predecessor employer recognizing the Local as the exclusive bargaining agent for the employees who were members of an appropriate bargaining unit,[3] filed charges with the NLRB on March 4, 1977, amended April

1. Section 10(j) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(j)[Act] provides for temporary injunctive relief pending final NLRB action as follows:

The Board shall have power, upon issuance of a complaint as provided in [§ 10(b) of the Act] charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court . . . within any district wherein the unfair labor practice in question is alleged to have occurred . . . for appropriate temporary relief or restraining order. Upon the filing of any such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant the Board such temporary relief or restraining order as it deems just and proper.

2. Section 8(a)(1) of the Act provides that it shall be an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." (§ 7 rights include *inter alia* "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."

Under § 8(a)(5) of the Act, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)." (§ 9(a) provides in relevant part: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . .")

3. The appropriateness of the alleged collective bargaining unit is not in dispute. It consists of "all employees engaged in housekeeping, laundry, repair and maintenance, restaurant and bar activities, exclusive of front desk, telephone, office, security (including guards), supervising personnel and employees of concessionaires." This description, to which the parties have stipulated, is quoted from the purported 1975 collective bargaining agreement between Local 170 and the predecessor employer MLH Development Co.

12. Local 170 alleged that the respondent, as a successor employer, had engaged in unfair labor practices within the meaning of sections 8(a)(1) and (5) of the Act by refusing to recognize and bargain with the union.

4. The General Counsel of the NLRB, upon the amended charge, issued a complaint pursuant to section 10(b) of the Act, alleging violations of sections 8(a)(1) and (5) by the respondent. Thereafter petitioner filed the instant action seeking a temporary injunction against respondent pursuant to section 10(j) of the Act.

5. Evidence relevant to the collective bargaining history between Local 170 and the predecessor employer was conditionally admitted into evidence.[4] This evidence discloses:

(a) That prior to the completion of construction of the hotel and related facilities, and before any members of the bargaining unit were hired, William Burns, an agent of the predecessor employer, conducted negotiations with Ralph Natale, secretary-treasurer and business manager of Local 170, from early March to April of 1975,[5] for the purpose of reaching an agreement regarding the terms and conditions of employment to be imposed upon employees to be hired by the predecessor at the hotel.

(b) Substantial agreement was reached by April 22, 1975,[6] the contract's language was finalized by May 7,[7] and the agreement was then signed and it became effective June 1, 1975,[8]

recognizing Local 170 as the exclusive bargaining agent for the relevant group of employees. This agreement was to expire in either December 1977, or May 1978.

(c) Bargaining unit employees were hired throughout May and June 1975, and the hotel commenced operations on June 5. Job applicants were told at their hiring interviews that they were required to become Local 170 members (Tr. II–116). No employee vote to designate Local 170 as the collective bargaining representative was ever taken; likewise no vote to ratify the contract was ever conducted.

(d) All bargaining unit employees were required to join Local 170 as a condition of employment; application for union membership and cards authorizing the withdrawal of union dues ["authorization cards"] were supposed to be signed at the time employment commenced (Tr. II–139 to 141).

6. Local 170 performed certain services for the hotel employees, including processing an unspecified number of employee grievances, according to the testimony of Natale and his successor Edward McBride (Tr. I–34, 39, 48). Natale visited the hotel premises for union business 20–30 times during the predecessor's operation, and he met the hotel's general manager Daniel Cummings on as many as nine occasions, as did McBride after the summer of 1976 (Tr. II–7, 8, 131).

7. The predecessor contributed to the employees' health and welfare funds and

4. When as here the respondent-employer seeks to introduce evidence of an unfair labor practice by the union which occurred more than six months prior to the union's filing of its complaint with the NLRB, such evidence may be excluded entirely or otherwise limited in its admissibility by § 10(b) of the Act, as interpreted in *Local 1424, IAM v. NLRB [Bryan Mfg. Co.]*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) and its progeny. The limited purposes for which this factfinding is made are discussed in text accompanying notes 22–26, *infra*.

5. See Ex. R–8, Burns deposition, at 5, 9.

6. See Ex. R–1, letter from Burns to hotel's general manager Moore, dated April 22, 1975, reciting general terms of agreement. The language was finalized by May 7, 1975.

7. See Ex. R–4, letter from hotel's general manager Moore to Local 170's business manager Natale.

8. See Ex. P–1, agreement between Local 170 and Mt. Laurel Hilton.

other benefits under the contract (Tr. I–55, 57), although it lagged behind in contributions by three months as of the sale in February, 1977 (Tr. I–51, 55). Union dues were deducted by the predecessor from the bargaining unit employees' pay, although due to bookkeeping problems and confusion regarding the authorization cards, the dues were often not withheld from employee paychecks (Tr. II–140 to 141).

8. There was evidence of growing discontent with the union, through reports which hotel manager Cummings heard from housekeeping supervisor Sandy Arnold and food and beverage supervisor Wayne Gotta (Tr. III–44 to 46), growing especially acute after October 1976, when months of back dues were withheld from employee paychecks (Tr. II–127 to 128; Tr. III–46). Cummings personally received seven complaints, including employees wanting to get out of the union (Tr. II–152 to 161). Ms. Arnold received complaints from employees concerning the union "repeatedly" (Tr. II–117), including requests to get out of the union. The assistant housekeeper Nancy Fallon testified that 90 per cent of the 24 or 25 workers under her supervision had expressed their opposition to the union, that she could recall six by name, and that she passed this information to Ms. Arnold (Tr. III–55, 60, 63). Several bargaining unit members also gave testimony of their belief of majority opposition to union representation around the time of the sale, including the shop steward for housekeeping (Tr. III–102, 104), which beliefs were conveyed to supervisors.

9. Despite these complaints, no member withdrew from the union or revoked the dues check-off authorization or filed any petition to decertify (or otherwise challenge) the union (Tr. III–7).

10. The sale was completed, and respondent commenced operation of the hotel on February 9, 1977, with the same employee complement, job classifications, equipment, prices, operating procedures and names of the hotel, bar and restaurant, all without interruption (Tr. I–21 to 22).[9] There is no evidence of any common ownership between the predecessor and the respondent.

11. After February 9, Local 170, through McBride, requested that the respondent make payments of benefits owed by the predecessor under the 1975 agreement, which payments the respondent refused to make. On February 24, the respondent refused to bargain with Local 170, or to recognize the union in any way. (Ex. R–9 at 27–28; Ex. R–7). The respondent filed a petition with the NLRB requesting a representation determination—a so-called RM Petition—on February 25, 1977 (Ex. R–7).

12. The number of employees in the bargaining unit and the degree of union support among these employees are, of course, highly relevant and material factors in determining whether the respondent, in refusing to bargain as a successor employer, had a reasonable and good faith doubt of the union's majority. At the hearing, it appeared that:

(a) For the payroll period ending February 26, 1977, there were 103 employees in the bargaining unit categories (Tr. III–111). Local 170 business manager Natale's estimate that there were 54 or 55 employees in the bargaining unit (Tr. I–51, 61, II–4) is supported by no evidence.

(b) On February 25, respondent possessed signed authorization cards for 29 of the 103 bargaining unit employees (Tr. III–97). Twenty-one of those cards were dated and, of those, 11 were dated within the six months immediately preceding February 25. (Id.)

---

9. Respondent's general manager informed employees that "there's been a change in owners. . . . As of Wednesday night 12 o'clock . . . . the old owners were out and the new owners were coming in. . . . As of 12 o'clock, every [employee] was terminated and as of 12:01 everyone was hired. . . ." (Tr. I–37 to 38.)

(c) The respondent was aware that Local 170 official McBride was circulating authorization cards among the bargaining unit employees to demonstrate majority status on or about February 23 (Tr. II–136 to 137). No cards thus obtained were submitted to respondent (Tr. II–137).[10]

13. After respondent refused to recognize Local 170, the union called a strike at respondent's restaurant and hotel facility. A number of employees refused to work and established a picket line;[11] some of these employees returned to work while others remained unemployed for varying periods of time (Tr. I–61 to 73), with different workers being hired over the next three weeks to perform their jobs (Tr. III–24 to 26).[12] There is no evidence of lockout, harassment, or similar discrimination, other than refusal to bargain, directed by respondent toward the union's supporters.[13] There is similarly no evidence that the picket line disrupted the hotel's operations, and it was discontinued.

14. General manager Cummings had doubted the union's majority status not only at the time of the sale and refusal to bargain in February, 1977, but every since he began his duties under the predecessor employer in October, 1975 (Tr. II–138). This conclusion was based on a number of factors already noted above, especially the individual complaints and complaints from department heads (Tr. II–138 to 142; Tr. III–46), and secondly the circumstances surrounding the inception of the bargaining relationship between the predecessor and Local 170 (Tr. II–130; III–68 to 69); the conclusion was not based upon the absence of a majority of signed authorization cards (Tr. II–142 to 143).

15. Cummings conveyed his opinion regarding lack of majority to Ralph Lewy, respondent's vice president and treasurer, working in Chicago (Tr. III–41, 71). Lewy made the decision to file the RM Petition for an election, on advice of counsel, in reliance upon Cummings' belief that less than 50 per cent of the employees desired to be union members (Tr. III–71, 72, 80). Lewy did not know how many were in the bargaining unit or how many complaints had been received (Tr. III–78). Lewy made the decisions to refuse recognition and to file the RM Petition; Cummings did not have a decision-making power in these matters.

Certain evidence was thus conditionally admitted. Natale, on behalf of Local 170, testified that 45 members joined the strike (Tr. I–61), although he was familiar with the names of only two of them (Tr. II–5, 6). Cummings, on behalf of respondent, testified that based upon payroll records 39 persons did not report for work at their scheduled times on February 25–26 shifts (Tr. II–137, III–17, 49 to 51), although this figure was apparently not determined until one week after the strike date (Tr. III–17).

**10.** There is no evidence that respondent knew how many signed cards were obtained by McBride. The actual number of cards obtained is not relevant to the issue of respondent's good faith doubt of the union's majority status, since the number was unknown to respondent when it refused to bargain. Testimony by McBride disclosed that in fact 38 such cards were obtained—less than a majority of the 103 member bargaining unit (Tr. III–82). This fact is not relevant unless the respondent has independently demonstrated a reasonable good faith doubt, thus shifting the burden of proof of actual majority back to the petitioner, as discussed in part II.B, *infra.*

**11.** The numbers of employees joining the strike is also not relevant to the respondent's existence of a good faith doubt when it refused to bargain, although the number may become relevant to rebut such a doubt if proven, in connection with petitioner's need to then demonstrate actual majority, *see* n. 10 *supra.*

**12.** Evidence of post-strike conduct was admissible for the relevance, if any, which it might have to the issue of "just and proper" relief (Tr. III–21 to 23A); *see* part II.C, *infra.*

**13.** *Id.*

## II. DISCUSSION

### A. *Standards for Relief under Section 10(j)*

Section 10(j) of the National Labor Relations Act [14] provides for temporary injunctive relief pending final disposition of an unfair labor practice charge before the NLRB upon a showing that the NLRB's regional director has reasonable cause to believe that a violation of the Act as charged has been committed and that such relief is "just and proper." *Eisenberg v. Hartz Mountain Corp.,* 519 F.2d 138, 141 (3d Cir. 1975); *Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185, 1188–89 (5th Cir. 1975); *Angle v. Sacks,* 382 F.2d 655, 661 (10th Cir. 1967).

The legislative history of section 10(j) of its companion, section 10(*l*) [15]—the so-called mandatory injunction section—expresses congressional concern for "the prompt elimination of the obstructions to the free flow of commerce and encouragement of the practice and procedure of free and private collective bargaining" pending the outcome of the often necessarily lengthy Board hearing, order, and enforcement procedures. S.Rep.No.105, 80th Cong., 1st Sess. 8 (1947); 1 *Legislative History of the Labor Management Relations Act of 1947* at 414 [hereafter *Legislative History*].

A major purpose is to grant relief where "substantial injury" might otherwise be likely to occur, recognizing that "it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo pending litigation." S.Rep.No.105, *supra,* at 27 (1947); *Legislative History, supra,* at 433.

■ The district court is granted a limited evidentiary role in the section 10(j) proceeding, because the court is to determine only whether the reasonable cause and "just and proper" standards have been met, and it is not to determine which party should ultimately prevail. *NLRB v. Acker Industries, Inc.,* 460 F.2d 649, 652 (10th Cir. 1972); *Angle v. Sacks, supra; accord, Balicer v. International Longshoremen's Ass'n,* 364 F.Supp. 205, 216 (D.N.J.), *aff'd* 491 F.2d 748 (1973) [granting section 10(*l*) injunction].

Generally, evidence favorable to the petitioner is to be accepted so long as it lies within the range of rationality, and where various inferences may reasonably be drawn from those facts, the inference more favorable to petitioner should be drawn, *see Danielson v. Joint Board, ILGWU,* 494 F.2d 1230, 1245 (2d Cir. 1974).

■ Some caution must be exercised, however, before the rationale of the section 10(*l*) mandatory injunction cases may be applied automatically to the instant section 10(j) situation. This is because the applicability of section 10(*l*) is limited to illegal organizational or jurisdictional strikes, secondary boycotts and hot cargo contracts, with which we are not here concerned.[16] Speaking of section 10(*l*), Judge Hastie stated, "In its nature any such conduct impinges directly upon the public interest in the free flow of commerce," in contrast to conduct addressed under section 10(j) wherein disruption of commerce is not necessarily implicated. *Eisenberg v. Hartz Mountain Corp., supra,* 519 F.2d at 141. Thus a district court might properly exercise its discretion to refuse injunctive relief in a non-disruptive section 10(j) situation, even if the petitioner demonstrates the arguable presence of the elements of the unfair labor practice as charged, if the court is unconvinced that such relief is "just and

---

14. Text of § 10(j) of the Act appears at n.1, *supra.*

15. *See* text accompanying n. 16, *infra.*

16. Under § 10(*l*) of the Act the NLRB is *mandated* to seek a temporary injunction when it has reasonable cause to believe that one of the enumerated unfair labor practices has occurred, namely within the meaning of §§ 8(b)(4)(A), (B), or (C), or of § 8(e) [anti-boycott], or § 8(b)(7) [illegal picketing].

proper" in terms of the public interests to be served by the Act. *Id.* at 142.

We find nothing in the legislative history which suggests that section 10(j) relief is to be freely granted upon the mere finding of probable cause that an unfair labor practice has occurred; Congress instead mandated a case-by-case balancing of the circumstances in section 10(j) cases to maximize the probability that such relief if granted will advance or protect the public interest without harming an important countervailing public policy prior to a final decision on the merits. The care with which this weighing should be made, in the absence of disruption of commerce, was alluded to by the Third Circuit in *Eisenberg v. Hartz Mountain Corp.,* *supra,* 519 F.2d at 141, wherein the court stated:

> Section 10(j), different from Section 10(1), creates jurisdiction to grant "just and proper" temporary relief pending Board decision upon any unfair labor practice charge, even though no disruption of commerce is charged. Thus, the exigencies of determining what relief, beyond enjoining disruption of commerce, is "just and proper" are likely to be of critical importance when relief is sought under Section 10(j) . . . .

■ The petitioner's legal theories interpreting the Act are to be afforded great deference by the district court; the NLRB is expert in administration of the complex statute, while district courts seldom encounter the Act. This acceptance of the petitioner's legal position is especially broad in the case of section 10(1) temporary injunctions, where the court is bound to accept the petitioner's theory so long as it is "substantial and not frivolous." *Samoff v. Building & Construction Trades Council,* 475 F.2d 203, 207 (3d Cir.), *vacated for mootness,* 414 U.S. 808, 94 S.Ct. 151, 38 L.Ed.2d 44 (1973); *Hirsch v. Building & Construction Trades Council,* 530 F.2d 298, 302–303 (3d Cir. 1976).

The purpose for such great deference toward the petitioner's legal theories in section 10(1) cases lies partly in the inherent disruptiveness of the strikes and boycotts to which that subsection is alone applicable. The role of the district court in section 10(1) cases "reflects the congressional determination that certain unfair labor practices are so disruptive that where there is reasonable cause to believe that they are being engaged in their continuance during the pendency of charges before the Board should not be permitted." *Schauffler v. Local 1291, International Longshoremen's Ass'n.,* 292 F.2d 182, 187 (3d Cir. 1961), *quoted in Samoff, supra,* 475 F.2d at 206–207. Again, the section 10(1) rationale does not necessarily apply with the same force in the non-disruptive instant section 10(j) proceeding.

Nonetheless, in considering whether the petitioner had reasonable cause to believe that the respondent has committed an unfair labor practice, this court will give broad deference to the legal theories advanced by the petitioner to construct the elements of its *prima facie* charge of an unfair labor practice. To require that the alleged unfair labor practice be rooted in established labor law might frustrate the congressional intent of preventing the compounding of an arguable unfair labor practice, during the period of time required by the Board for final determination of the legal as well as factual issues. The making of fine legal distinctions to resist or revise the petitioner's theory has no place in the consideration of whether the petitioner's legal theory is "substantial and not frivolous," *Samoff v. Building & Construction Trades Council, supra,* even in the case of the relatively non-disruptive conduct addressed under section 10(j).

We first consider whether the petitioner, under a substantial legal theory, has reasonable cause to believe that respondent's refusal to recognize Local 170 is violative of the Act.

B. *Refusal to Recognize and Bargain under Sections 8(a)(1) & (5)*

1. *Prima facie case.*

■ Respondent Pick-Mt. Laurel is a successor employer which acquired the hotel-

restaurant facilities preserving the essential nature of the operations and retaining a majority of the employees in the relevant positions. A successor employer has the duty to recognize and bargain with an incumbent union which has been certified as the bargaining representative for the appropriate employee unit. *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 281, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

The NLRB urges that the duty to recognize an incumbent union exists not only in the case of a union which had been certified subsequent to a free election by the employees, as in *Burns, supra*, but also where a contract was negotiated after voluntary recognition by the employer's predecessor, as in *Eklund's Sweden House Inn, Inc.*, 203 N.L.R.B. 413 (1973) and in *Barrington Plaza & Tragniew, Inc.*, 185 N.L.R.B. 962 (1970), *enf. denied in part sub nom. NLRB v. Tragniew, Inc.*, 470 F.2d 669 (9th Cir. 1972). In both of these cases, however, there was strong evidence of majority support for the incumbent union either through unanimous employee ratification of the most recent collective bargaining agreement (*Sweden House*), or through a history of union representation under a series of collective bargaining contract negotiations and renewals (*Barrington Plaza*).

In the instant case, the predecessor employer recognized Local 170 prior to the commencement of operations, before the hiring of any substantial number of employees; the unit employees had no choice but to accept the union as their agent for collective bargaining. The respondent suggests, and the petitioner concedes,[17] that the initial recognition of Local 170 by the predecessor was unlawful as a recognition of a non-majority union, *see International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). The respondent urges that it cannot be compelled to bargain as a successor employer, where such a duty is triggered solely by the existence of a collective bargaining agreement which was illegal when made with a union which has not been shown to have ever enjoyed the support of an uncoerced majority of the employees.

The petitioner's theory is that the union is entitled to a presumption of majority status flowing from the pre-existing collective bargaining agreement, lawful on its face, between Local 170 and the predecessor employer.[18] Such a presumption may be rebutted by proof by the employer that the majority had been lost or by proof of a good faith doubt of the union's continuing majority status based on objective considerations.[19]

The presumption of continued majority status for a certified incumbent union was defined in *Laystrom Manufacturing Co.*, 151 NLRB 1482 (1965),[20] and adopted by the Third Circuit in *NLRB v. Frick Company*, 423 F.2d 1327, 1330–31 (3d Cir. 1970), and by other circuit courts.[21] One purpose of this presumption is to promote stability in

---

**17.** Supp. Br. for Petitioner at 7.

**18.** *Jackson Sportswear Corp.*, 211 NLRB 891, 900–901 (1974); *Dayton Motels, Inc.*, 192 NLRB 674 (1971), *rev'd in part, NLRB v. Dayton Motels, Inc.*, 474 F.2d 328 (6th Cir. 1973).

**19.** *United Supermarkets, Inc.*, 214 NLRB 958 (1974); *Automated Business Systems*, 205 NLRB 532 (1973).

**20.** The NLRB in the *Laystrom* case, *supra*, 151 NLRB at 1483–84, held:

Absent unusual circumstances, there is an irrebuttable presumption that the majority status of a certified union continues for 1 year from the date of certification. After the

first year the certificate still creates a presumption of majority status, but the presumption is normally rebuttable by an affirmative showing that the union no longer commands a majority. Moreover, where the certificate is a year or more old an employer may withhold further bargaining without violating the Act and insist that the union re-establish its statutory representative status if, but only if, he in good faith has a reasonable doubt of the union's continuing majority. [Footnotes omitted.]

**21.** Enforcement of the Board's order in *Laystrom, supra*, was denied, 359 F.2d 799 (7th Cir. 1966), but the Board's position has been adopted in other courts, *see, e. g., Terrell Machine Co. v. NLRB*, 427 F.2d 1088, 1090 (4th Cir.),

the collective bargaining relationship. This was described in *Emerson Manufacturing Co.*, 200 NLRB 148, 150 (1972), which involved a certified union:

> The requirement of demonstrable and reasonably based grounds for challenging an incumbent union's presumed continued majority status at the end of a contract term is designed to effectuate statutory policy of promoting stability in a collective-bargaining relationship without foreclosing employees' freedom of choice. Quite clearly, it would only be disruptive of stable and uninterrupted bargaining relationships to allow employers at their option, and without good reason therefor, to put unions to the burden and expense of going through an election campaign at the end of each contract term to reestablish their majority status as a condition to the negotiation of a new contract.

Furthermore, the Third Circuit has held that withdrawal of recognition from a union that was voluntarily recognized should be governed by the same standards as withdrawal of recognition of a Board-certified union. *NLRB v. Frick Company, supra.*

This court cannot say that the extension of the benefit of this presumption to non-certified unions in their relationships with successor employers, as noted above, is inconsistent with the statutory policy of promoting stability of established collective bargaining relationships, nor is the application of such a policy to the facts of this case irrational. "The fact that this theory has not been tested in this particular factual context does not require a contrary determination." *Balicer v. International Longshoremen's Ass'n.*, 364 F.Supp. 205, 226 (D.N.J.), *aff'd* 491 F.2d 748 (1973).

■ This court finds that the petitioner's legal theory of this *prima facie* unfair labor practice charge is substantial and not frivolous; namely, there is sufficient support for the proposition that a successor employer is obligated to recognize and bargain with an incumbent union which is a party to a pre-existing collective bargaining agreement, in the absence of proof of actual minority or of the successor employer's good faith doubt of majority status, because the union is entitled to a presumption of majority status without proof that a majority of the employees has actually chosen or supported the union or approved the agreement.

There is reasonable cause to believe, prior to considering respondent's rebuttal, that the elements of this *prima facie* unfair labor practice are present. Accordingly, we must consider the respondent's assertion of the existence of a reasonable good faith doubt which would rebut the petitioner's *prima facie* showing.

### 2. *Respondent's defenses.*

The respondent Pick-Mt. Laurel urges two theories in rebuttal: *first*, that the predecessor's 1975 collective bargaining agreement with the union was a sham, void *ab initio* and therefore incapable of supporting the presumption of majority status; and *second*, that it had a reasonable good faith doubt of the union's majority status based upon facts which it first learned near the time of acquiring the hotel, including the facts surrounding the initial recognition of the union in 1975. Each of these claims requires consideration of the proper impact of the six-month limitation rule in section 10(b) of the Act,[22] which the petitioner would employ as an exclusionary rule barring respondent's reliance upon any event—notably the circumstances of the 1975 agreement—occurring more than six months prior to respondent's refusal to recognize Local 170 in February, 1977.

> That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . . .

---

*cert. denied*, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970); *NLRB v. Gulfmont Hotel Co.*, 362 F.2d 588 (5th Cir. 1966).

**22.** Section 10(b) of the Act provides in relevant part:

■ Section 10(b) provides by its terms that the Board may not issue a complaint based upon an unfair labor practice which occurred more than six months prior to the filing of the charge with the Board. The Supreme Court interpreted section 10(b) in *Local 1424, IAM v. NLRB [Bryan Manufacturing Co.]*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960), holding that an NLRB complaint challenging the continuing enforcement of an unlawful minority union contract is time-barred where the contract was executed more than six months prior to the filing of the charge. The policies underlying section 10(b) are

> to bar litigation over past events "after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused." H.R.Rep.No. 245, 80th Cong., 1st Sess., p. 40, and of course to stabilize existing bargaining relationships.

*Bryan Manufacturing Co., supra*, 362 U.S. at 419, 80 S.Ct. at 828. Section 10(b) bars reliance upon the fact of an agreement's unlawful execution to find an unfair labor practice where no unfair labor practice could otherwise be demonstrated within the six-month limitation period.[23] Section 10(b) would be frustrated if an unfair labor prac-tice could be established by exclusive reliance upon conduct occurring prior to the limitation period. This does not mean, however, that all evidence of conduct prior to the period is barred for all purposes.

The admissibility of past events turns upon the purpose for which the evidence is offered. The Supreme Court distinguished the above situation—in which section 10(b) prohibits evidence of an out-dated unfair labor practice to necessarily establish a current unfair labor practice—from the situation where

> occurrences *within* the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to *shed light on the true character of matters occurring within the limitations period*; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events.

Id. at 416, 80 S.Ct. at 826. [emphasis added].

Evidence of the circumstances surrounding a time-barred unfair labor practice may thus be admissible to explain the actions of the charged party within the limitations period, while the same evidence would not be admissible to conclusively demonstrate the existence of a continuing unfair labor practice, or otherwise to attach a legal label to the latter conduct as lawful or unlawful. The Board has held that these evidentiary teachings of the *Bryan* case are equally applicable to proofs offered by the respondent as a matter of defense, *International Hod Carriers Local 1298*, 153 NLRB 659 (1965) [*Roman Stone*]; *Barrington Plaza & Tragniew, Inc., supra*.

■ First, with these principles in mind, we think that the respondent's evidence that Local 170 represented no members of the bargaining unit when the 1975 contract was negotiated and signed; *i. e.*, that Local

---

**23.** The Supreme Court in *Bryan Manufacturing Co., supra*, 362 U.S. at 415, 80 S.Ct. at 826, endorsed the union's position that "the union security clause and its enforcement were wholly innocent; that they were tainted only by virtue of the original unlawful execution of the agreement; and that since a complaint based upon that unfair labor practice was barred by limitations, that event itself could not be utilized to infuse with illegality the otherwise legal union security clause or its enforcement." Thus, the Court concluded:

> Where, as here, a collective bargaining agreement and its enforcement are both perfectly lawful on the face of things, and an unfair labor practice cannot be made out except by reliance on the fact of the agreement's original unlawful execution, an event which, because of limitations, cannot itself be made the subject of an unfair labor practice complaint, we think that permitting resort to the principle that § 10(b) is not a rule of evidence, in order to convert what is otherwise legal into something illegal, would vitiate the policies underlying that section.

170 was a minority union and implying that the contract was a "sweetheart contract," is inadmissible for the purpose of nullifying the contract itself, which is otherwise lawful on its face. Admitting such evidence to void the contract and to thereby undermine the statutory presumption of continuing validity of bargaining agreements is not permissible where the contract necessarily has presumptive validity but for the untimely evidence. That is, where the challenge to the collective bargaining agreement is mounted exclusively on evidence of a time-barred unfair labor practice, the evidence cannot be received. In this circumstance, section 10(b) recognizes that the Act's interest in industrial peace through stable bargaining relationships is to be given preference "even at the expense of the vindication of statutory rights." *Bryan Manufacturing Co., supra,* 362 U.S. at 428, 80 S.Ct. at 833.

On the other hand, the respondent's alternative purpose for admission of evidence of the circumstances surrounding the 1975 contract's inception is to shed light upon its refusal to bargain, as background evidence buttressing respondent's analysis of the various timely events which allegedly gave rise to its good faith doubt of majority status. This is a very different purpose from invalidating the contract; instead, the respondent would show that when it learned in early 1977 that the union had been recognized by the predecessor employer for purposes of collective bargaining prior to having any union members in the bargaining unit, the respondent's suspicion of lack of union majority support at the time of its acquisition was bolstered. This is a permissible purpose for use of evidence of pre-limitation period conduct. The evidence is relevant only to show the back-

ground against which the respondent's timely belief of lack of majority status was reached, and the bargaining history was but one of several factors actually considered. The respondent's belief, of course, must have been principally based upon its observations and experiences in the six-month period; it could not disregard signs of majority support during the time of acquisition and refusal to bargain, nor could its refusal to bargain be based exclusively upon the prior bargaining history.

This limited evidentiary use of events outside the statutory six-month period which bear upon lack of majority representation within that period was permitted in *NLRB v. Tragniew, Inc.,* 470 F.2d 669 (9th Cir. 1972), *denying enf. in part to Barrington Plaza & Tragniew, Inc., supra,* and in *NLRB v. Dayton Motels, Inc.,* 474 F.2d 328 (6th Cir. 1973), *denying enf. in part to* 192 NLRB 674 (1971).

In *Tragniew, supra,* a successor employer sought to introduce evidence of the union's loss of a representation election shortly before the execution of the original collective bargaining agreement which gave rise to the union's presumptive majority status. In defense of a charge of refusal to bargain, the successor employer was held by a panel of the Ninth Circuit to not be barred by section 10(b) from introducing the election evidence to illustrate the manner in which the union "obtained and operated under its collective bargaining agreements," 470 F.2d at 673, as a background to amplify its doubts arising from events such as employee coercion and vigorous union solicitation of the employees occurring during the limitations period.[24]

In *Dayton Motels, supra,* newly-discovered evidence of complicity and coercive tac-

---

**24.** The decision by another panel of the Ninth Circuit two months after *Tragniew, supra,* in *NLRB v. Denham,* 469 F.2d 239 (9th Cir. 1972), is not contrary to the *Tragniew* rationale. In *Denham,* the court considered the admissibility of evidence of coercion of employees which occurred prior to the six-month period preceding filing of a charge against the successor employer for refusal to bargain. The employer offered no evidence of a coerced majority with-

in the six-month period. Its defense was based solely upon events occurring outside the limitation period. Accordingly, the evidence was barred by § 10(b) of the Act, the court distinguishing the *Tragniew* decision by stating, 469 F.2d at 245:

This is not a case in which evidence of events occurring before the six-month period is sought to be used to show that matters within the period constituted unfair labor prac-

tics of a company supervisor in obtaining a union majority was held to be admissible to be considered along with other evidence of events during the six-month period indicating absence of majority status, even though inadmissible for the purpose of invalidating the collective bargaining agreement, 474 F.2d at 332–333.

■ Against the rationale of *Tragniew, Dayton Motels*, and similar cases,[25] and given the lack of competing precedents, the court is persuaded that the petitioner's attempt to employ section 10(b) to exclude consideration of evidence that the union had no members in the bargaining unit at the time it was recognized for purposes of collective bargaining by the predecessor employer in 1975 would be inconsistent with the Supreme Court's reasoning in *Bryan Manufacturing Co., supra*, when applied to the undisputed facts of this case. The court cannot accept petitioner's exclusionary theory. Even assuming that petitioner's legal

position on matters of admissibility of evidence is entitled to as equally great deference as its theories of substantive law in section 10(j) proceedings, the court finds the petitioner's argument for total exclusion of all pre-10(b) conduct to be insubstantial, *cf. Hirsch v. Building & Construction Trades Council, supra*, 530 F.2d at 302–303.[26]

Whether the respondent actually had a serious good faith doubt of majority status based upon "a rational basis in fact"[27] is a determination for the finder of fact and not for this court in a section 10(j) proceeding. This court, although having the benefit of hearing extensive live testimony, is to draw the factual inferences most favorable to the petitioner and it is to accept petitioner's version of disputed facts, as discussed in part II.A, *supra*. This does not mean that the court is free to disregard undisputed facts favorable to the respondent.

With these standards in mind, and for purposes of this section 10(j) proceeding

---

tices. *Bryan Mfg. Co., supra*, [362 U.S.] pp. 416–417 [80 S.Ct. 822], . . .

**25.** *See, e. g., United Packinghouse, Food & Allied Workers Int'l Union v. NLRB*, 135 U.S. App.D.C. 111, 416 F.2d 1126, *cert. denied sub nom. Farmers' Co-op. Compress v. United Packinghouse, Food & Allied Workers Int'l Union*, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969); *NLRB v. MacMillan Ring-Free Oil Co.*, 394 F.2d 26 (9th Cir.), *cert. denied sub nom. Oil, Chemical & Atomic Workers Union v. NLRB*, 393 U.S. 914, 89 S.Ct. 237, 21 L.Ed.2d 199 (1968); *NLRB v. Ritchie Mfg. Co.*, 354 F.2d 90 (8th Cir. 1965).

**26.** The court also finds some appeal in the respondent's position that it should not be barred by § 10(b) from relying upon the prior bargaining history where it first learned of these facts within the limitation period, citing language from the Board's recent decision in *Don Burgess Construction Corp.*, 227 NLRB ——, 95 L.R.R.M. 1132, 1137 (1977) that:

The period of limitations prescribed by Section 10(b) does not begin to run on an alleged unfair labor practice until the person adversely affected is put on notice of the act constituting it.

In that case, the employer's fraudulent concealment of its misconduct prevented the timely filing of a charge by the union. This cannot mean, however, that the successor employer is entitled to revive an old unfair labor practice in order to nullify the collective bargaining agree-

ment, where the employees, as persons assumedly adversely affected by a minority union, had knowledge but failed to complain to assert their § 7 rights. On the other hand, where (as in the instant case) the successor employer first learns of the bargaining history as one factor during the § 10(b) period coloring its analysis of other objective events contributing to its doubt of majority status occurring within the § 10(b) period, the *Burgess Construction* rule of actual knowledge seems properly applicable. We need not decide this issue, however, in view of the court's determination of the admissibility of such evidence, *supra*.

**27.** In *NLRB v. Frick Co., supra*, 423 F.2d at 1330–31, the Third Circuit said:

An employer must, however, come forward with evidence casting "serious doubt on the union's majority status." *Stoner Rubber Co.*, 123 NLRB 1440, 1445 (1959). As the court said in *NLRB v. Rish Equipment Co.*, [407 F.2d 1098, 1101 (4th Cir. 1969)]: " '[M]ore than an employer's mere mention of [its good faith doubt] and more than proof of the employer's subjective frame of mind' * * * [are necessary.] What is required is a 'rational basis in fact.' " [Citing: *NLRB v. Gulfmont Hotel Co.*, 362 F.2d 588, 589 (5th Cir. 1966); *NLRB v. Downtown Bakery Corp.*, 330 F.2d 921, 925 (6th Cir. 1964); *NLRB v. John J. Swift Co.*, 302 F.2d 342, 346 (7th Cir. 1962).]

only,[28] the court assumes: that the respondent knew of the union's presumptive majority status (presumed to flow from the predecessor's contract with the union);[29] that the union performed services for its members including processing grievances and enforcing the contract's provisions for payments of dues by the employees and for contributions to the union's health and welfare fund by the predecessor;[30] and that no employee withdrew from the union.[31]

The court also accepts the undisputed evidence favorable to the respondent and known to it at the time of refusal to bargain: that there was discontent with the union among a large number of the employees, although not necessarily a majority, as judged from the complaints to several supervisors,[32] that union membership was required by the predecessor as a condition of employment, but that the union was nevertheless sufficiently unsure of its majority status that it solicited authorization card signatures subsequent to respondent's acquisition of the hotel facility, and that no cards thus solicited were turned in;[33] and that all this occurred against a background of negotiations and representation in which no employee had an opportunity to choose the union to be his or her representative through election, ratification or otherwise.[34]

The petitioner suggests that this evidence does not establish a reasonable good faith doubt of union majority in the absence of actual majority resignation from the union or of majority petition for decertification.[35]

Documented complaints from less than a majority of the employees are said to be incapable of fostering a good faith doubt, *Valley Nitrogen Producers, Inc.*, 207 NLRB 208, 214 (1973).

The respondent does not have the burden of proving an actual numerical majority opposing the union; but it must demonstrate that it had objective reasons for doubting the majority status. *Laystrom Manufacturing Co., supra.*[36] Ample authority suggests that the employer may rely upon subjective evidence to bolster objective facts tending to show lack of majority support, so long as the employer's determination is primarily based upon objective considerations which are asserted in good faith. *See, e. g., Orion Corp. v. NLRB,* 515 F.2d 81, 85 (7th Cir. 1975), and cases cited therein; *see also NLRB v. Dayton Motels, Inc., supra,* 474 F.2d at 331–332; *United Supermarkets, Inc.,* 214 NLRB 958 (1974), *petition for review denied,* 90 L.R.R.M. 3344 (5th Cir. 1975).

Beyond the complaints and the indications of lack of union support which the respondent observed, there is the additional background factor of the collective bargaining history and lack of employee choice. That this union negotiated and executed the collective bargaining agreement without the choice or designation by any member of the bargaining unit reasonably fueled the respondent's suspicions of lack of majority support derived from its own observations. This is a factor not present in

**28.** Findings by the district court in a § 10(j) proceeding, being interlocutory in nature, are directed to the purpose of granting or denying temporary relief only. *See NLRB v. Acker Industries, Inc., supra,* 460 F.2d at 652.

**29.** Finding of Fact 5(b), *supra.*

**30.** *Id.* 6 & 7, *supra.*

**31.** *Id.* 9, *supra.*

**32.** *Id.* 8, *supra.*

**33.** *Id.* 5(d) & 12(c), *supra.*

**34.** Id. 5(a), (b), (c).

**35.** For cases in which an employer's good faith doubt was found to be supported by such measures by a majority of employees, see *The Freeman Co.,* 194 NLRB 595 (1971); *GAF Corp.,* 195 NLRB 169 (1971); *Cubit Systems Corp.,* 194 NLRB 622 (1971); *Wigwam Stores, Inc.,* 193 NLRB 471 (1971); *Standard Scientific,* 195 NLRB 995 (1972).

**36.** *See* n. 20 & 21, *supra.*

cases cited by the petitioner [37] demanding a more exacting arithmetic basis for a good faith doubt.

Persons seeking employment were presented with a *fait accompli* requirement of union membership; under such circumstances even a subsequent majority could be shown to have been fostered by the apparent union authority with which to solicit employee support, a likelihood recognized by the Supreme Court in *International Ladies' Garment Workers Union v. NLRB, supra*, 366 U.S. at 736, 81 S.Ct. 1603.

In the instant case, there is no objective evidence that the union generated actual majority support despite the obviously advantageous position into which it was placed by the initial recognition. That there was not even apparent majority support manifested by the time of acquisition is a rather remarkable fact indicating at least indifference and perhaps lack of support toward the union's presence. The respondent could properly rely on this deduction.

■ In summary, for the limited purposes of this hearing, this court finds that there is substantial credible and uncontroverted evidence of the existence of respondent's good faith doubt based upon the respondent's reasonable consideration of evidence within its knowledge at the time, which, even when viewed in the light least favorable to the respondent, is sufficient to rebut the presumption of majority status.

The elements of the *prima facie* unfair labor practice are thus rebutted, and the burden of proof of actual majority shifts to the petitioner, *see, e.g., Automated Business Systems v. NLRB*, 497 F.2d 262, 269 (6th Cir. 1974). We are directed to no evidence of actual majority and our review of the record discloses none.[38]

In conclusion, in view of the respondent's persuasive rebuttal to the petitioner's *prima facie* case, the facts fail to support a finding that the petitioner has reasonable cause to believe that a violation of the Act as charged has been committed.

### C. *"Just and Proper" Temporary Relief*

Even if the petitioner had succeeded in satisfying the "reasonable cause" requirement, the court finds that the relief sought is not just and proper in terms of the public interests to be served by the Act. *Eisenberg v. Hartz Mountain Corp., supra*, 519 F.2d at 142.

■ Temporary relief in a section 10(j) proceeding is "just and proper" where it appears that the "efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless" without relief *pendente lite*. *Angle v. Sacks, supra*, 382 F.2d at 660; *NLRB*

---

**37.** *See* n. 35, *supra*.

**38.** Of approximately 103 members in the bargaining unit, the respondent possessed signed authorization cards for 29 (Finding of Fact 12(b), *supra*); at most 45 refused to report to work, in sympathy with the union (*Id.* 13 & note 11, *supra*). We are aware that requiring a strict numerical approach to proofs of majority status is not desirable in these cases, according to *Department Store Food Corp. of Pa. v. NLRB*, 415 F.2d 74, 77 n. 4 (3d Cir. 1969):

We reject at the outset petitioners' contention that this case can be solved by the application of a strict numbers game. We see no valid reason to restrict the Board to a mathematical approach in evaluating the [existence of an untainted majority]. Instead, we accept the analysis of the Fifth Circuit in *NLRB v. Clement Bros. Co.*, 407 F.2d 1027 (C.A. 5,

1969), where it held that it was appropriate for the Board to consider the numerical evidence as supportive of other permissible inferences . . . . .

It has also been held that the failure of a majority of employees to support a strike "does not give rise to a presumption that these employees have repudiated the union as their bargaining representative." *Coca Cola Bottling Works, Inc.*, 186 NLRB 1050, 1053 (1970). Theoretically the Board after considering all the evidence could by inferences find a union majority status. On the limited record before us, however, we find no evidence to support a finding of actual majority to overcome the respondent's demonstration of a good faith doubt for purposes of this temporary injunction hearing.

*v. Acker Industries, Inc., supra,* 460 F.2d at 652. Preserving the status quo as it existed prior to the alleged unfair labor practice is a consideration in granting or denying such temporary relief. *Boire v. Pilot Freight Carriers, Inc., supra,* 515 F.2d at 1194; *Seeler v. Trading Port, Inc.,* 517 F.2d 33, 38 (2d Cir. 1975). Finally, such relief must advance the public interest by serving the policies of the Act and not by merely temporarily vindicating private rights of an affected group. *Eisenberg v. Hartz Mountain Corp., supra,* 519 F.2d at 141–142.

The temporary relief sought by the petitioner is to enjoin and restrain the respondent from refusing to recognize or bargain with Local 170 as the collective bargaining representative of the employees in the unit. The requested temporary relief would be the equivalent of a bargaining order requiring the respondent to immediately recognize and bargain with the union.

A bargaining order has been granted as temporary relief in certain cases where the union's majority status has been certified by the Board subsequent to a valid election by the employees in the unit. *See Lebus v. Manning, Maxwell & Moore, Inc.,* 218 F.Supp. 702 (W.D.La.1963); *Brown v. Pacific Telephone & Telegraph Co.,* 218 F.2d 542 (9th Cir. 1955) [rev'g denial of injunctive bargaining order]; *Davis v. Servis Equipment Co.,* 341 F.Supp. 1298 (N.D.Tex.1972).

Applications for bargaining orders have been granted in several section 10(j) proceedings where the union had not won an NLRB election, but in each case there was ample objective evidence of actual majority support as well as some aggravating employer misconduct. *See Seeler v. The Trading Port, Inc., supra,* 517 F.2d at 37–39; [39] *Smith v. Old Angus, Inc.,* 82 L.R.R.M. 2930 (D.Md.1973); and *Henderson v. Gibbons & Reed Co.,* 53 CCH Lab. Cas. ¶ 11,081 (D.N.M.1966).[40] In such cases the bargaining order was found to be "just and proper" relief.

Where, however, there is a serious dispute regarding the majority status of a non-certified union, and no affirmative evidence of majority at any time, the courts have generally denied injunctive bargaining relief even in the presence of reasonable cause to believe that an unfair labor practice has been committed. *Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185 (5th Cir. 1975); *Fuchs v. Steel-Fab, Inc.,* 356 F.Supp. 385 (D.Mass.1973); *Kaynard v. Lawrence Rigging, Inc.,* 80 L.R.R.M. 2600 (E.D.N.Y.1972).

In the instant case a mandatory bargaining order would recognize a union which has not shown that it ever received the support of an uncoerced majority of workers. Even if the respondent had failed to rebut the presumption of majority status, this court would be reluctant to compel recognition by the successor employer, where there is a substantial possibility of installing a minority union and frustrating the concept of majority choice. All this is said in the context of a status quo which is free of employer force, coercion, inducements or other bad faith practices to defeat the union.

█ The employer did not penalize the union members who demanded recognition. Instead, the employer filed a petition for an

---

**39.** In *Trading Port, supra,* the Second Circuit reversed the denial of a bargaining order request where the union demanded recognition possessing a majority of signed authorization cards subsequent to an organizing campaign. The record was also full of employer threats and reprisals against union members. The court's holding was very narrow:

> We hold only that when the Regional Director makes a showing, based on authorization cards, that the union at one point had a clear majority and that the employer then

engaged in such egregious and coercive unfair labor practices as to make a fair election virtually impossible, the district court should issue a bargaining order under § 10(j).

517 F.2d at 40.

**40.** In both *Old Angus, supra* and *Gibbons & Reed Co., supra,* the bargaining orders were based on authorization card majorities to protect the demonstrated union majority support from dissipation.

NLRB representation determination shortly after its acquisition of the hotel and before any unfair labor practice charge was filed by the NLRB.[41] Strikers were allowed to return to work, with no questionable enticements by the respondent to do so. Employees who did not return suffered temporary unemployment in most cases; the evidence did not show that their unemployment was a continuing and irremedial prospect.[42] If after full hearing the Board determines that a bargaining order should issue, the plight of the unemployed workers could be addressed by appropriate remedial relief.

■ Likewise the court does not perceive that the loss of contractual benefits during this interim period warrants temporary relief in this case. First, the substantive provisions for benefits under the old collective bargaining contract, even if presumptive majority status currently existed, are unenforceable against a successor employer which is not in privity with its predecessor or which has not agreed to be bound by the contract. *NLRB v. Burns International Security Services, Inc., supra,* 406 U.S. at 281–291, 92 S.Ct. 1571. Second, the respondent does not appear to have reduced the overall package of benefits; its conduct appears to be economically neutral.

■ This court is mindful that in the absence of a bargaining order the employees will be denied the potential benefits of collective bargaining, including perhaps grievance procedures which were utilized under the prior contract. But the court will not order recognition and bargaining as temporary relief when there is no evidence of an uncoerced majority of employees who choose union representation, and no evidence of employer bad faith or provocation,

and no evidence that a later Board order will be nullified or rendered meaningless; the consequences of such relief could mean the installation of a bargaining agent for all employees against the will of a majority, in violation of the section 7 rights "to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing."

Were it probable that the Act's goals of industrial peace and encouragement of free collective bargaining would be frustrated by an employer's unfair labor practice *pendente lite,* this court would not hesitate to grant the relief. But this does not appear to be such a case, from the evidence before the court.

## III.  CONCLUSION.

For the reasons stated herein, the court finds that the respondent has rebutted petitioner's belief that an unfair labor practice has been committed, and that even in the absence of such rebuttal the granting of temporary relief pending a final Board determination would not be "just and proper" under the circumstances of this case.

The petition will be denied, and the complaint will be dismissed.

---

**41.** This is the proper procedure for a successor employer in respondent's position, according to the Board in *Barrington Plaza & Tragniew, Inc., supra,* 185 NLRB at 964. Of course, the filing of an RM Petition by the employer is not probative of the existence of a good faith doubt of majority status. *See Cavalier Div. of Seeburg Corp.,* 192 NLRB 290, 305 (1971). But it may be indicative of the employer's desire for an early and orderly determination of the dispute.

**42.** To the extent that private rights, rather than collective rights, are implicated herein, § 10(j) requires advancement of only the public interests when determining just and proper relief. *Eisenberg v. Hartz Mountain Corp., supra,* 519 F.2d at 141–142.