519 F.2d 138
 89 L.R.R.M. (BNA) 2705, 77 Lab.Cas. P 10,938
 Arthur EISENBERG, Regional Director of the Twenty-second
Region of the National Labor Relations Board, for
and on Behalf of the NATIONAL LABOR
RELATIONS BOARD,
v.
The HARTZ MOUNTAIN CORPORATION, Appellant.
Arthur EISENBERG, Regional Director of the Twenty-second
Region of the National Labor Relations Board, for
and on Behalf of the NATIONAL LABOR
RELATIONS BOARD,
v.
The HARTZ MOUNTAIN CORPORATION.
Appeal of LOCAL 806, a/w International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and Helpers of
America, Intervenor.
 Nos. 74-1773, 74-1774.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 22, 1974.
Decided June 13, 1975.
 
 Peter M. Fishbein, Kaye, Scholer, Fierman, Hays & Handler, New York City, Michael S. Waters, Newark, N. J., for appellant in No. 74-1773.
 Joseph S. Rosenthal, Steven J. Weiss, Friedlander, Gaines, Cohen, Rosenthal & Rosenberg, New York City, for appellant in No. 74-1774.
 Marvin Roth, Deputy Asst. Gen. Counsel, N.L.R.B., Washington, D. C., for appellee N.L.R.B.
 Lewis M. Steel, Eisner, Levy & Steel, New York City, for appellee charging party.
 Before HASTIE, GIBBONS and WEIS, Circuit Judges.
 OPINION OF THE COURT
 HASTIE, Circuit Judge.
 
 
 1
 For a number of years a local of Retail Clerks International Association (AFL-CIO) had been the bargaining representative of the workers employed at the Jersey City facility of Hartz Mountain Corporation. On May 11, 1973, a proper election resulted in the decertification of that union. Immediately thereafter, District 65, Distributive Workers of America, launched a vigorous effort to organize the plant and quickly obtained signatures of a majority of the employees on authorization cards. On this basis and only about two weeks after the decertification of the Retail Clerks, the employer was asked to recognize District 65 as the bargaining representative of its workers. However, Hartz denied this request for recognition, taking the position that an insufficient period had elapsed since the decertification of Retail Clerks for employee opinion to become settled and firm.
 
 
 2
 During November, 1973, a third union, Teamsters Local 806, began an organizational drive and, as the district court has found in this case, obtained authorization cards signed by a majority of the workers and demanded recognition, which Hartz granted December 3, 1973. On January 3, 1974, Hartz and Local 806 signed labor contracts containing union security clauses, under which Local 806 became the bargaining representative for two units of Hartz workers for a term to expire November 30, 1976.
 
 
 3
 This recognition of the Teamsters caused District 65 and the Retail Clerks Association to file unfair labor practice complaints against the employer Hartz, although the complaint of the Retail Clerks was subsequently withdrawn. The District 65 complaint became the basis of a formal unfair labor practice charge against Hartz which the Regional Director of the National Labor Relations Board undertook to implement by petitioning a district court for a temporary injunction under Section 10(j) of the National Labor Relations Act, as amended, pending the outcome of the Administrative proceeding against Hartz. The district court permitted Teamsters Local 806 to intervene.
 
 
 4
 Although Hartz and Local 806 asked that oral testimony be received, the court authorized and required that the case be submitted on affidavits. This was done.
 
 
 5
 The court concluded that the Regional Director of the Board "had reasonable cause to believe" that the employer "deliberately involved itself in the organization activities of Local 806 and actively sought this Union's approval from its employees, thus committing an unfair labor practice as defined in the Act." The court then considered whether it would be "just and proper" within the intendment of Section 10(j) to issue the requested injunction. It concluded that the continuation of Local 806 as bargaining representative during the pendency of the unfair labor practice proceeding was likely to cause "erosion of support from District 65" which would prejudice "any future election that might subsequently be ordered by the Board," if District 65 should prevail before it. This reasoning led the court to issue a temporary injunction which, in principal part, restrained Hartz from "giving effect to the collective bargaining agreements with the Teamsters executed on or about January 3, 1974" and from recognizing "Teamsters as the collective bargaining representative of any of its employees unless and until Teamsters had been certified (as such) by the Board . . . ." Thereafter, Hartz sought the court's permission to keep in effect a part of the collective bargaining agreement that created an employees' health and welfare fund pursuant to Section 302 of the Labor Management Relations Act. However, the Board objected to this and the court declined to modify its injunction. This appeal from the injunction followed.
 
 
 6
 Section 10(j) of the Act, a provision of the National Labor Management Act of 1947, reads as follows:
 
 
 7
 "(j) The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."
 
 
 8
 29 U.S.C. § 160(j).
 
 
 9
 Along with Section 10(j) Congress also enacted Section 10(l ) which provides:
 
 
 10
 "(l ) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law . . . ."
 
 
 11
 29 U.S.C. § 160(l ).
 
 
 12
 The present appeal requires us to consider for the first time[1] the proper application of Section 10(j). However, some guidance is provided by this court's opinion, handed down nearly twenty years ago, on an appeal from an order that had granted temporary relief under the companion Section 10(l ). In Schauffler v. Highway Truck Drivers & Helpers, Local 107, 3d Cir. 1956, 230 F.2d 7, we held that to justify Section 10(l ) relief, a district court must "find that there is reasonable cause to believe that a violation of the act as charged has been committed" and then "proper(ly) exercise . . . judicial discretion" as to the appropriateness of particular relief. 230 F.2d at 9. Our concern about the appropriateness of particular relief was shown by our holding that the allegedly offending union, though properly enjoined from continuing acts that seemed to constitute a secondary boycott should not, in litigation ancillary to the undecided unfair labor practice proceeding against it, be required in addition to post notices "confess(ing) by implication (to) a violation of the statute of which they have not been found guilty." 230 F.2d at 13.
 
 
 13
 Illegal organizational or jurisdictional strikes, secondary boycotts and hot cargo contracts are the specified wrongs that are the subject matter of Section 10(l ). In its nature any such conduct impinges directly upon the public interest in the free flow of commerce. Accordingly, Congress indicated that, once it should appear likely that a respondent's conduct was of this type, a court might properly grant a temporary injunction restraining the disruptive action until the Board could fully hear and decide the underlying controversy about it.[2] But, as we decided in Schauffler v. Highway Truck Drivers & Helpers, supra, even in a 10(l ) proceeding, relief beyond that needed to stop ongoing disruption of commerce is inappropriate, absent some persuasive showing that to grant it before the merits of the unfair labor practice claim had been decided would, in the circumstances of the particular case, be "just and proper."
 
 
 14
 Section 10(j), different from Section 10(l ), creates jurisdiction to grant "just and proper" temporary relief pending Board decision upon any unfair labor practice charge, even though no disruption of commerce is charged. Thus, the exigencies of determining what relief, beyond enjoining disruption of commerce, is "just and proper" are likely to be of critical importance when relief is sought under Section 10(j), even as they were on the issue of posting notices in Schauffler.
 
 
 15
 Some general guidance is provided by the Senate Report explaining and justifying the addition of Section 10(j), a provision which did not appear in the bill as first passed by the House of Representatives. That Report states that the new subsection was added so "that the Board, acting in the public interest and not in the vindication of purely private rights, may seek injunctive relief in the case of all types of unfair labor practices. . . . " Senate Report No. 105, 80th Cong., 1st Sess. 8, 1 Legislative History of the Labor Management Relations Act, 1947, at 414 (emphasis added). But, beyond that, Congress has left the courts to determine, case by case, what judicial action will be "in the public interest." Accordingly, we inquire whether, in the circumstances of this case, it can properly be concluded that the order suspending the collective bargaining contract and depriving the employees of a bargaining representative until the Board shall decide the unfair labor practice controversy was "just and proper" in the sense of being "in the public interest."
 
 
 16
 It is a fundamental objective of our national labor relations legislation to promote wholesome and mutually acceptable labor relations and the settlement of labor disputes through collective bargaining between employees and their employer. And to protect the integrity of collective bargaining it is required that the bargaining representatives of the employees be freely chosen by them. The charge here is that the employer improperly influenced its employees' selection of Teamsters Local 806 to be their representative. However, there is no suggestion here that the labor contract negotiated by Teamsters Local 806 was unfair or unfavorable to the Hartz employees. There is no suggestion that this union is company dominated. Thus, the process of collective bargaining and the resultant labor contract seem to have promoted the fundamental objective of the national regulatory scheme. Nevertheless the district court seems to have considered the suspension of collective bargaining to be "just and proper," in the sense of advancing the public interest, because it may protect a rejected union against possible further erosion of employee support until the Board can decide whether the employer improperly influenced employees to support the union that prevailed. It is noteworthy that the feared erosion would be likely to occur only if the incumbent union should represent the employees satisfactorily. A perceptive writer, considering the consequences that may result from allowing a labor contract to stand as negotiated between employer and an unduly favored union, has had this to say:
 
 
 17
 " . . . The employees are still free to evaluate the agreement, weigh its terms against those negotiated elsewhere by the rival organization, and consider the arguments of the opposing union that even greater benefits will result under its leadership. . . . Under these circumstances, the new contract may give the voters more concrete evidence than they would otherwise have as to what will happen if they retain the favored union."[3]
 
 
 18
 While society is concerned generally that competition between labor unions be fair, in the National Labor Relations Act the requirement that employers not aid a favored union serves primarily as a means of facilitating the law's undertaking to protect the integrity and effectiveness of collective bargaining. When the issue in this case is approached this way, problematic damage to the minority union, whose loss of majority employee support may or may not be attributable to employer support of a rival union, cannot outweigh public concern to avoid the clear deprivation of ongoing fundamental benefits of collective bargaining that this injunction imposes upon the Hartz employees.
 
 
 19
 Indeed, details of this case not heretofore mentioned make the claim that the public interest is served by temporary injunctive relief exceptionally weak. The Regional Director's assertion of "reasonable cause" to believe that Hartz had been guilty of an unfair labor practice was based upon sworn statements to the effect that the employer had urged three or four employees to support Teamsters Local 806. These allegations were strongly contradicted by opposing affidavits. But for present purposes we will assume that the Board may ultimately find that the employer improperly influenced the adherence of particular employees to the union.[4]
 
 
 20
 The record also shows that, without counting the four workers said to have been unduly influenced, a clear majority of the employees authorized this union to represent them. It is the rule of this circuit that "where a clear majority of the employees, without subjection to coercion or other unlawful influence, have made manifest their desire to be represented by a particular union, there is no factual basis for a contention that the employer's action thereafter in recognizing the union or contracting with it is an interference with their freedom of choice." NLRB v. Air Master Corp., 3d Cir. 1964, 339 F.2d 553, 557. True, we also have recognized that "if certain of the votes were tainted . . . other votes could be suspect as well." See Department Store Food Corp. of Pa. v. NLRB, 3d Cir. 1969, 415 F.2d 74, 77 footnote 4. But, as the Board itself has recognized, some evidence confirmatory of suspicion thus found is necessary before, in fairness to the employees, a union that has won majority support and employer recognition can properly be deprived of representative status. Wylie Mfg. Co., 1968, 67 LRRM 1638, enf'd sub nom. NLRB v. Wylie Mfg. Co., 10th Cir. 1969, 417 F.2d 192.
 
 
 21
 In the present case, the district court recognized "that the documented incidents . . . (of improper employer intercession) were few." However, in the court's view, the additional fact that Hartz recognized the Teamsters on the basis of authorization cards some six months after it had refused to recognize District 65 on the basis of a similar showing of majority support, provided sufficient indication that the Teamsters' majority had not been fairly won. But, as a matter of law, it is entirely proper for an employer to reject a union's showing of majority support, as Hartz did, in the unsettled period immediately after another union has been decertified. And the Board has held that such a refusal to recognize does not make it improper for the employer to recognize yet another union on the basis of a similar showing, made some months later but still less than a year after the decertification had indicated an unsettled situation. Buitoni Foods Corp., 1960, 45 LRRM 1384, enforced without discussing this point, sub nom. NLRB v. Buitoni Foods Corp., 3d Cir. 1962, 298 F.2d 169.
 
 
 22
 In sum, the Regional Director may have had reasonable cause to believe that the employer had made improper statements to a very small number of employees. But on the present record it seems as likely as not that a majority of the Hartz employees freely chose to be represented by Teamsters Local 806. In these circumstances we hold that problematical private harm to the minority union could not make it "just and proper" to issue a temporary injunction that has nullified the majority choice and in so doing has rendered disservice to the public interest by depriving all Hartz employees of the benefit of an existing and seemingly fair labor contract for a substantial period, pending final Board disposition of the unfair labor practice complaint.[5]
 
 
 23
 Separate from and in addition to the foregoing analysis, this case brings into sharp focus another problem that arises when a temporary injunction is granted under Section 10(j). The record shows that General Counsel issued the unfair labor practice complaint against Hartz in February, 1974. Hearings before an administrative law judge began during the spring of 1974. Now, a year later, so far as we are informed, the matter is still pending at this initial administrative hearing stage.
 
 
 24
 Overworked courts understand and are sensitive to the problems of overworked administrative agencies. But courts should and do give priority to matters of great urgency, particularly those in which need for relief is said to be so great as to justify the extraordinary remedy of temporary injunction. By the same token we think the administrative sense of urgency that leads to a suit for temporary injunctive relief under Section 10(j) should not abate once an injunction issues. Rather, the administrative law judge and, after him, the Board should hear and dispose of the controversy expeditiously.[6] Indeed, we think a pledge of expeditious administrative action is necessarily implicit in a petition for a Section 10(j) injunction. Otherwise, a temporary injunction, entered without reaching the ultimate merits of a dispute may become, in effect, a final disposition of the controversy. Indeed, at the present pace of administrative procedure, it is conceivable that the three-year collective bargaining agreement, that was temporarily suspended by the injunction in this case, may expire in 1976 of its own time limitation before the Board determines whether the union was the lawful bargaining representative of the employees. While we do not attribute to anyone an intention to abuse the process of the district court, that can be the result if a Section 10(j) injunction remains in effect overlong.
 
 
 25
 In our view, a six-month period from the date of issuance of a Section 10(j) injunction should suffice, save in the most extraordinary circumstances, for the completion of expedited action by an administrative law judge on the underlying complaint. Accordingly, we hold that in this circuit such an injunction should include an explicit time limitation, not longer than six months, on the restraint it imposes. If it is believed that injunctive relief or its continuation is warranted after the findings and recommendations of the administrative law judge have been entered, upon proper petition in an appropriate case a district judge may grant or continue a Section 10(j) injunction for an additional period of not more than six months to permit Board action upon those recommendations. Moreover, these six-month limitations shall not preclude a district judge from extending the life of any Section 10(j) injunction for an additional thirty-day period upon a showing that administrative action on the underlying controversy seems to be imminent.
 
 
 26
 For these reasons the judgment will be reversed and the cause remanded for vacation of the temporary injunction.
 
 
 
 [1]
 The annual reports of the Board show how infrequently it asks for judicial relief under the 28-year-old Section 10(j). Thus, in 1974, 17 such petitions were filed; in 1973, only 9, and in 1972, 19. Commentators have urged more frequent resort to this interim procedure, but not in the type of case we have here. Donald J. Siegel, Section 10(j) of the National Labor Relations Act: Suggested Reforms for an Expanded Use, 1972, 13 B.C.Ind. & Com.L.Rev. 457; The Role of the Temporary Injunction in Reforming Labor Law Administration, 1972, 8 Colum.J. of Law & Soc.Prob. 553. And see McCulloch, New Problems in the Administration of the Labor-Management Relations Act: The Taft-Hartley Injunction, 1962, 16 Sw.L.J. 82, 99
 
 
 [2]
 "The Section 10(l ) procedure reflects (a legislative) determination that certain unfair labor practices are so disruptive that where there is reasonable cause to believe that they are being (indulged) their continuance during the pendency of charges before the Board should not be permitted. S.Rep. No. 105, 80th Cong., 1st Sess., pp. 8, 27." Schauffler v. Local 1291 International Longshoremen's Assn., 3d Cir. 1961, 292 F.2d 182, 187
 This court also has held that a clearly disruptive ongoing strike should be enjoined even though there would remain unresolved until final Board action a substantial contested legal question whether, in the circumstances of the case, the strike was an unfair labor practice. Samoff v. Building & Const. Trades Council of Phila., 3 Cir. 1973, 475 F.2d 203.
 
 
 [3]
 Derek C. Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 1964, 78 Harv.L.Rev. 38, 118
 
 
 [4]
 On this appeal Hartz and Local 806 properly point out that the district court did not explicitly find that reasonable cause existed to believe that Hartz had been guilty of the alleged misconduct. Instead, the court stated its conclusion negatively: "I do not find it unreasonable or improbable that the respondent deliberately involved itself in the organizational activities of Local 806 and actively sought this Union's approval from its employees thus committing an unfair labor practice as defined by the Act." In our view, any finding of "reasonable cause to believe" should be stated affirmatively. But our decision here does not in any way turn upon this point
 
 
 [5]
 Our disposition of this appeal makes it unnecessary to decide whether denial of an evidentiary hearing was reversible error. However, we observe that disruption of commerce to the prejudice of the public interest is likely to be demonstrable without an evidentiary hearing in Section 10(l ) cases. But in many Section 10(j) cases, where this feature is absent, an evidentiary hearing may be essential to informed decision whether an injunction would be in the public interest
 
 
 [6]
 Cf. McLeod v. General Electric Co., 2d Cir. 1966, 366 F.2d 847, 850