Louis J. D'AMICO, Regional Director
for the Fifth Region of the National
Labor Relations Board, Petitioner,

v.

The A.G. BOONE COMPANY,
Respondent.

Civ. A. No. 86–0499–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

Nov. 20, 1986.

James P. Lewis, NLRB, Reg. 5, Balti-
more, Md.

Lloyd C. Caudle, Caudle & Spears, Charlotte, N.C., Glenn, Flippin, Feldman & Darby, Roanoke, Va., for respondent.

## OPINION

TURK, Chief Judge.

The petitioner, the Regional Director of the National Labor Relations Board, has moved under section 10(j) of the Labor-Management Relations Act ("the Act") for an injunction ordering the A.G. Boone Company to reopen its Montvale, Virginia trucking terminal pending the final disposition of unfair labor practice complaints against Boone that are currently before an Administrative Law Judge ("ALJ") of the National Labor Relations Board ("NLRB or "The Board"). The court finds that the petitioner has reasonable cause to believe that Boone has violated the act. It also finds, however, that the injunction sought would be neither just nor proper because it could not restore the status quo, would have little remedial effect, and would not serve the public interest. For these reasons, further explained herein, the court denies petitioner's motion for an injunction.

## BACKGROUND

This case involves the A.G. Boone Company's (Boone) Montvale, Virginia trucking terminal where 19 people formerly were employed. Boone closed the terminal on June 17, 1986. The petitioner charges that the closure was discriminatorily motivated by anti-union animus and therefore violated sections 8(a)(1), and (3) and (5) of the Act. 29 U.S.C. § 158 (1982). Boone disagrees and contends that only changed economic circumstances motivated the decision to close; a legitimate business action with unfortunate but unavoidable labor consequences.

Boone is a contract carrier trucking business. Unlike a common carrier, a contract carrier does not ship goods for any customer but only for specific customers with whom it is under contract. Boone's primary customer in Virginia is the Kroger company. Kroger, incidentally, owns its own trucking fleet and is in the position of being both Boone's competitor as well as its customer. The work that Kroger ships out to contract carriers like Boone is that freight which it chooses not to haul in its own trucks.

Earlier this year Boone was confronted with two concurrent developments that eventually resulted in the current controversy. One was the organization of its employees by Local Union No. 171 of the International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America ("the Union"). The other was a series of business decisions by Kroger Company that seriously reduced the volume of business at the Montvale terminal.

### A. *The Union and the NLRB*

On April 13, 1986 Boone's Montvale employees held an election and chose the Union as their representative. On April 28, the NLRB certified the Union as the official collective bargaining agent for the Montvale employees.

Between May and August, the Union filed allegations with the NLRB that Boone engaged in unfair labor practices in violation of sections 8(a)(1), (3), and (5) of the Act. The allegations were that Boone threatened employees before the election that it would close the terminal or reallocate certain work if the Montvale workers elected the Union; that Boone's subsequent loss of trucking runs and eventual shutdown occurred in retaliation for the employees choice to organize; and that Boone effectuated its Montvale shutdown while refusing the Union's request to bargain about the loss of jobs that a shutdown or transfer of operations would create.

Based on these allegations, the NLRB General Counsel brought charges against Boone before the Board. The ALJ heard testimony and received exhibits on these charges at a hearing on October 8, 1986. A decision is still pending. At the hearing, Boone denied the Union's allegations. In its defense, Boone offered evidence of the economic changes it faced around the same

time as the Union drive and of the business decisions with which it responded.

## B. *The Flower-Run Experiment*

In early 1986 Boone and Kroger engaged in an experimental venture for shipping flowers via the Montvale terminal. After a six week trial period, it became clear that Boone could not effectively ship flowers. Kroger therefore terminated the flower runs. Kroger's decision reduced the number of runs available to Boone's Montvale truckers.

## C. *The Milk Runs*

Before April, 1986 Boone's Montvale drivers handled milk runs from Kroger's dairy in Lynchburg to destinations in Savannah, Georgia. Boone then entered a contract with A & P to haul goods from Charlotte, to Greensboro, North Carolina. Boone discovered that it could save $200.00 per trip by adding the Lynchburg-Savannah run to the new Charlotte-Greensboro run, thereby eliminating Montvale drivers from the Lynchburg-Savannah route. On April 21–22 Boone moved its three Lynchburg-Savannah runs from Montvale to its Charlotte terminal. As a result the Montvale terminal lost 2,700 of its weekly trucking miles.

## D. *The Kroger Bakery Runs*

The largest source of business for the Montvale terminal was Kroger's bakery in Roanoke, Virginia. In 1983, Kroger renegotiated its bakery contract with Boone and Boone was faced with a 20% reduction in its rates. The rate reduction turned the Montvale Facility into an economically marginal operation. On June 13, 1986 Kroger announced that it was closing the Roanoke bakery. The bakery shutdown cost the Montvale terminal 4,400 miles per week. In response, Boone laid off five employees, two of whom returned on July 6. Following the bakery closing the already depleted Lynchburg dairy shipments remained as the only source of business for the Montvale terminal.

## E. *The Shutdown*

On July 24 Boone announced to its employees that it would soon replace the Montvale terminal with a smaller garage in Madison Heights, Virginia. Whereas the Montvale terminal was 37 miles from the Lynchburg dairy, the Madison Heights operation was a short drive. Furthermore, the reduced load no longer justified the crew of mechanics and supervisors needed to support the full service terminal in Montvale. A garage in Madison Heights for fewer trucks and geographically convenient to Lynchburg would be more cost effective and would mean at least a $100,-000.00 per year economic benefit to Boone.

On August 17th the still active Montvale employees struck to protest the layoffs and the proposed shutdown, events they interpreted as unfair labor practices. The next day, Boone opened the Madison Heights terminal and finally shutdown the Montvale terminal.

The Regional Director now asks the court to issue an injunction under section 10(j) of the Act ordering Boone to reopen the Montvale terminal until the ALJ issues an opinion in the pending unfair labor practice case. He insists that the injunction is necessary to prevent Boone from disposing of the Montvale terminal. Such a disposal, the petitioner contends, would render ineffective any restorative remedy that the NLRB might prescribe in the event it finds that Boone did violate the Act.

## DISCUSSION

### I. *Injunctions Under Section 10(j)*

 Section 10(j) of the Act gives District Courts the discretion to grant injunctive relief upon the Board's petition in pending unfair labor practice cases. 29 U.S.C. § 160(j) (1982) Congress enacted section 10(j) to ensure that employers facing unfair labor practice charges will maintain the status quo while the Board conducts the often lengthy administrative proceedings. *S.Rep. No.* 105, 80th Cong. 1st Sess. 27 (1947), *I Legislative History of the Labor Management Relations Act,* 1947, at

433 (1948), *cited in,* 2 *The Developing Labor Law,* 1638–39 (C. Morris, ed. 1983). To decide whether a section 10(j) injunction is appropriate in a particular case, courts apply a two step analysis. First, they determine whether there is "reasonable cause to believe that the alleged violations have occurred." *Levine v. C & W Mining Co., Inc.,* 610 F.2d 432, 435 (6th Cir.1979); *Fuchs v. Hood Industries, Inc.,* 590 F.2d 395, 397 (1st Cir.1979). They then apply the statutory standard, which is to determine whether an injunction in the case would be "just and proper." 29 U.S.C. § 160(j) (1982); *Eisenberg v. Lenape Products, Inc.,* 781 F.2d 999, 1004 (3rd Cir.1986).

*A. Reasonable Cause*

■ The burden requiring the NLRB to justify an injunction with "reasonable cause" is not statutory and has developed in the courts. 2 *The Developing Labor Law,* supra, at 1639 n. 34. Under this standard, a district court may grant the requested relief when the evidence viewed in a light most favorable to the petitioner could reasonably support a finding that the respondent violated the Act. *Id.* at 2704; *Seeler v. Trading Post, Inc.,* 517 F.2d 33, 37 (2d Cir.1975). This standard is relatively lenient and requires considerably less than a showing that the petitioner will eventually prevail on the merits. *Danielson v. Joint Bd. of Coat, Suit, & Allied Garment Workers Union,* 494 F.2d 1230, 1245 (2d Cir.1974) (applying same standard in case for injunction under section 10(*l* )).

*B. Just and Proper*

■ Whether an injunction is just and proper can depend on three variables: whether it will preserve or restore the status quo, *McLeod v. General Electric Co.,* 366 F.2d 847, 850 (2d Cir.1966), *set aside on other grounds,* 385 U.S. 533, 535, 87 S.Ct. 637, 639, 17 L.Ed.2d 588 (1967), whether it will serve the public interest, *Eisenberg v. Hartz Mountain Corp.,* 519 F.2d 138, 143 (3rd Cir.1975), and whether it will further the basic remedial purpose of the Act. *Squillacote v. Meat & Allied Food Work-*

*ers, Local 248,* 534 F.2d 735, 744 (7th Cir. 1976).

*II. The Regional Director Has Demonstrated Reasonable Cause*

*A. Claims Under Section 8(a)(1) and 8(a)(3)*

Under section 8(a)(1) an employer may not interfere, coerce, or restrain employees in their right to organize. 29 U.S.C. § 158(a)(1). Similarly, section 8(a)(3) proscribes an employer's discriminating with respect to tenure of employment for the purpose of discouraging membership in a labor organization. 29 U.S.C. § 158(a)(3) (1982). The petitioner charges it has reasonable cause to believe that Boone violated section 8(a)(1) by threatening its drivers that electing a union would necessarily lead to a loss of jobs and possibly a shutdown. It further charges that it has reasonable cause to believe that Boone violated section 8(a)(3) by closing the Montvale terminal on June 17. The court agrees.

■ Testimony by Boone drivers at the administrative law hearing raises the possibility that Boone's agents or representatives did tell certain drivers that a Union election could jeopardize their jobs. Although the Administrative Law Judge alone is responsible to decide conclusively whether these statements actually were threats in violation of section 8(a)(1), his ultimate conclusion is irrelevant to the present "reasonable cause" determination. *See Danielson supra* at 1245. The court's role is only to gauge whether the testimony could support the Regional Director's reasonable opinion that Boone violated section 8(a)(1). Giving the Board the benefit of the doubt, the court finds that in the unstable economic atmosphere of the Boone terminal in April and after, certain of the alleged statements by Boone representatives could reasonably be construed as violations of section 8(a)(1).

■ Similarly, the court concludes that the Board has reasonable cause to believe that Boone violated Section 8(a)(3) when it closed the Montvale terminal. When em-

ployees lose their jobs during and immediately following a hotly contested labor dispute, it is reasonable for them to conclude that they were fired in retaliation for their labor activities. The court feels that evidence of the extrinsic economic circumstances in this case—independent business decisions of the Kroger company—may eviscerate the Board's claim. It is, however, the task of the Administrative Law Judge to weigh the sufficiency and relative strength of each party's evidence. The court's only role here is to determine whether the Regional Director has reasonable cause to believe his allegations. Given the circumstantial coincidence of the Union election and subsequent shutdown, the court concludes that there is reasonable cause to believe that Boone's shutdown violated section 8(a)(3).

### B. The Section 8(a)(5) claim

Section 8(a)(5) makes it an unfair labor practice for an employer to refuse to bargain collectively with its employees. Relying on this section, the Regional Director charges that it was an unfair labor practice for Boone to refuse to bargain about the transfer from Montvale to Madison Heights. The court, however, disagrees that Boone's refusal to negotiate about the closing justifies a reasonable belief that section 8(a)(5) was violated.

■ An employer's duty to bargain is limited to matters of "wages, hours and other terms and conditions of employment." 29 U.S.C. §§ 158(d), 159(a) (1982). Economic decisions that do not effect these labor issues are clearly beyond the scope of collective bargaining. *Fiberboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 223, 85 S.Ct. 398, 409–10, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring). Other business decisions, like the terminal closing at issue here, involve both economic issues and employment issues. Nonetheless, the Supreme Court has held that "an employer's need to operate freely in deciding to shut down part of the business for purely economic reasons outweighs the incremental benefit that might be gained through

the Unions' participation in making that decision." *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 686, 101 S.Ct. 2573, 2584, 69 L.Ed.2d 318 (1981). Despite the adverse and unfortunate labor consequences a plant closing may produce, an employer is not statutorily obligated to discuss that closing with its employees' representative. *Id.*

Thus, Boone was under no statutory duty to negotiate with its employees about the Montvale to Madison Heights transfer. Its refusal to do so, therefore, cannot support a finding that there is reasonable cause to believe that Boone violated section 8(a)(5).

### III. An Injunction in this case is not "Just and Proper"

In light of the finding that the Regional Director has reasonable cause to believe that Boone has violated the Act, the court now tries to determine whether a section 10(j) injunction would be "just and proper." On this point, the petition for an injunction must fail.

■ An injunction will be just and proper when it is necessary to preserve or restore the status quo, *McLeod supra*, 366 F.2d at 850, when it will serve the public interest in maintaining the integrity of the collective bargaining system, *Hartz Mountain, supra*, 519 F.2d at 143, and when it will serve the remedial purposes of the Act. *Squillacote, supra*, 534 F.2d at 744. An injunction in this case will accomplish none of these purposes.

There is no doubt that it was Boone's decision alone to ultimately destroy the status quo by closing the Montvale terminal and by moving to Madison Heights. Most of the economic changes that prompted the closing, however, were Kroger's business decisions—the cancellation of the floral runs, and most importantly, the bakery closing. As to the other business change that preceded the closing, even the NLRB implicitly concedes that Boone's realloca-

tion of the milk runs was a legitimate business strategy.

An injunction in this case would hardly restore Montvale's status as a viable business venture. It would force Boone to reopen the Montvale terminal but could do nothing further to restore the levels of business and employment that existed before April. An effective injunction would require the court to turn the clock back to before Kroger made the independent decisions that sharply curtailed the volume of work at the Montvale terminal. It is impossible for the court to do so.

For similar reasons, it can hardly be said that an injunction in this case would serve the remedial purposes of the Act. The court cannot find any remedial effect in an injunction that would reopen the workplace but would be unable to recreate jobs that disappeared as a result of extrinsic economic changes.

The court can further envisage no argument that could demonstrate how the toothless injunction urged by the Regional Director could serve the public interest. Since the Montvale to Madison Heights move, the level of service to the public has remained constant. Boone has maintained the same Lynchburg milk runs that it serviced before the move. If anything, a court mandated return to Montvale would disserve the public by reinstating the less cost effective system of shipping Lynchburg milk in Montvale trucks stationed 37 miles away.

## CONCLUSION

Although the Regional Director has demonstrated reasonable cause to believe that Boone has violated at least two sections of the National Labor Relations Act, the court cannot find that it would be just and proper to enjoin Boone to reopen its Montvale terminal. The Regional Director's petition for an injunction under section 10(j) of the Act therefore will be denied.

An order consistent with this opinion will be entered on this day.