Gerald KOBELL, Regional Director for
Region Six of the National Labor
Relations Board, Plaintiff

v.

BEVERLY HEALTH AND REHABIL-
ITATION SERVICES, INC., et al.,
Defendants.

Civil Action No. 96–1280.

United States District Court,
W.D. Pennsylvania.

April 4, 1997.

Dalia Belinkoff, Julie Rose Stern, National Labor Relations Board, Pittsburgh, PA, for Gerald Kobell.

Terrence H. Murphy, Michael J. Manzo. Joseph F. Quinn, Klett, Lieber, Rooney & Schorling, Pittsburgh, PA, for Beverly Health and Rehabilitation Services, Inc., Beverly Enterprises–Pennsylvania, Inc.

Ronald A. Berlin, Berlin, Boas & Isaacson, Pittsburgh, PA, Michael J. Healey, Claudia Davidson, Healey, Davidson & Hornack, Pittsburgh, PA, for District 1199P, Local 585, Service Employees International Union, Pennsylvania Social Services, Union Local 668.

## MEMORANDUM AND ORDER

D. BROOKS SMITH, District Judge.

### I. Introduction

Before the court in this labor controversy is a Petition for Injunction filed by Gerald Kobell, the Regional Director for Region Six of the National Labor Relations Board (hereinafter "the Board") against Beverly Health and Rehabilitation Services, Inc., some of its subsidiaries and twenty of its health care facilities in the Commonwealth of Pennsylvania (hereinafter collectively referred to as Beverly). The petition seeks temporary relief pursuant to § 10(j) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(j), pending the resolution of unfair labor practice charges filed with the Board by employees of the twenty Beverly health care facilities. I conducted an evidentiary hearing on February 19 and 20, 1997, and the following constitute my findings of fact and conclusions of law.

### II. Facts

I previously addressed cross-motions for partial summary judgment in this case and determined that the Board's legal theory was substantial and not frivolous. See dkt. no. 67. An excerpt from my memorandum disposing of those cross-motions supplements the record from the hearing and sets forth certain undisputed facts which are necessary to the resolution of the instant motion for injunctive relief.

> Beverly owns and operates over 750 health care facilities nationwide which provide care for elderly or infirm individuals. The service and maintenance employees at twenty of these health care facilities in Pennsylvania are unionized.[1] Dkt. no. 19, ¶ 3. The most recent collective bargaining agreements [CBAs] expired on November 30, 1995, except at two of the facilities where the agreements expired on December 31, 1994. Dkt. no. 19, ¶ 5.

---

1. The service and maintenance employees at these twenty Beverly health care facilities are represented by three local unions of the Service Employees International Union: District 1199P represents employees at eleven of the facilities; Local Union 585 represents employees at five of the facilities, and the employees at the remaining four facilities are represented by Local Union 668. Dkt. no. 77, at 10–11.

Despite the expiration of the collective bargaining agreements, the unionized staff continued to work while negotiations proceeded. The unionized employees complained that certain changes at the health care facilities where they worked violated their rights under the NLRA to engage in concerted activity. The following examples represent some of the alleged violative conduct by Beverly: removal of union bulletin boards; denial of established access, at the respective facilities, of union representatives to union members; changes in health care insurance; reduction in work hours; unilateral changes in employee policies; denial of information relevant to contract negotiations; prohibitions against wearing union insignia; and prohibitions against bringing union literature onto the premises. It is also alleged that Beverly had direct contact with unionized employees in an effort to influence them concerning their continued affiliation with the union. Dkt. no. 1. These alleged unfair labor practices resulted in the filing of numerous charges with the Board against Beverly. *See* dkt. no. 1.

Dkt. no. 67, at 2–3.

The alleged unfair labor practices occurred at some, but not all, of the health care facilities. Dkt. no. 77, at 27–32; pl.exh. 1. The predominant unfair labor practices were the removal of union bulletin boards and the denial of employee access at the health care facilities to the union representatives. Pl. Exh. 1.

Thereafter the unions voted to authorize strikes at fifteen of the facilities.

On or about March 15, 1996, the unions gave notice to the fifteen facilities of their intent to engage in an unfair labor practice strike commencing at 7:00 A.M. on Friday, March 29, 1996. The notice specifically stated that the written notice was being served as required by § 8(g) of the NLRA, enacted as part of the 1974 Nonprofit Hospital Amendments to the Labor Management Relations Act. 29 U.S.C. § 158(g). Dkt. no. 18, exh. A.

On March 27, 1996, the unions gave an additional notice to the fifteen facilities, this time advising of their intent to extend the commencement of the strike from Friday, March 29, 1996 at 7:00 A.M. to Monday, April 1, 1996 at 6:00 A.M. It is undisputed that Beverly did not consent, either orally or in writing, to this 71 hour extension.

The unions were advised by Beverly that the extension notice failed to fulfill the literal statutory requirements set forth in § 8(g), and that it would consider unlawful any strike held pursuant to the seventy-one hour extension notice. Despite Beverly's lack of consent, a strike began on April 1, 1996 at the fifteen facilities, and continued until April 4, 1996 at about 7:00 A.M. Dkt. no. 67, at 3–4.

The union notices to Beverly of its intent to strike at each of the fifteen facilities state that the "union shall begin to engage in a strike, picketing and other concerted refusal to work activities to *protest unfair labor practices* committed by Beverly...." Dkt. no. 76, exh. A (emphasis added). The extension notices from the union also state that "the Union shall engage in an unfair labor practice strike...." *Id.*, exh. B (emphasis added). Beverly acknowledged the union's characterization of its activity as an unfair labor practice strike when it responded to the union that it considered the union's notice of the 71 hour extension defective. *Id.*, exh. C.

After the strike concluded on April 4, 1996, Beverly refused to reinstate many of the striking employees, despite an unconditional offer by all of them to return to work. Beverly reinstated to their former positions a total of 290 employees, from April 1996 to January 1997. Dkt. no. 77, at 62. Another 237 employees were recalled, but not to their former positions. Many of the employees were recalled to part-time capacities in different positions, or to different shifts from those they had worked in before the strike. Dkt. no. 77, at 61. As of January 1997, 66 employees had not been reinstated and a total of 115 employees had either quit or been fired. Dkt. no. 77, at 60–66; pl. exh. 14.

[O]n May 9, 1996, the Board issued an order consolidating all of the unfair labor practice charges against Beverly, and a consolidated complaint and notice of hear-

ing were filed with the agency. Dkt. no. 1, ¶ 5(a). The Board issued an amended consolidated complaint on June 19, 1996. *Id.,* ¶ 5(b).

On July 8, 1996, the Board initiated this action by filing a consolidated Complaint and Petition for Injunction Under Section 10(j) of the NLRA, requesting "appropriate injunctive relief" pending its final disposition of the unfair labor practice charges against Beverly. Dkt. no. 1. The Board contended that there was "reasonable cause" to believe the allegations that Beverly engaged in the unfair labor practices cited in its administrative complaint against Beverly. It further claimed that injunctive relief to prohibit Beverly from continuing to engage in conduct allegedly violative of sections 7 and 8 of the NLRA would be "just and proper." In the absence of injunctive relief, the Board contended that Beverly would continue to "restrain and coerce employees in the exercise of the rights guaranteed in Section 7 of the Act. . . ." Dkt. no. 1, ¶ 8. The Board further claimed that, unless Beverly is enjoined, a "serious flouting of the Act will continue, with the result that enforcement of important provisions of the Act and the public policy underlying the same will be thwarted. . . ." *Id.,* at ¶ 9. The prayer for injunctive relief not only addressed the conduct constituting the alleged unfair labor practices which occurred prior to the strike, but also requested the reinstatement to their former positions of all employees who had unconditionally offered to return to work on April 4, 1996 following the April 1 strike *Id.,* ad damnum clause ¶¶ 1 and 2.

Dkt. no. 67, at 5–6.

During the evidentiary hearing before me, the Board called several witnesses to testify. The chief witness was Thomas V. DeBruin, the president of Local 1199P and the designated chief spokesperson in contract negotiations for all three locals. Dkt. no. 77, at 15.

DeBruin's testimony established that, after the expiration of the collective bargaining agreement, the bulletin boards in many of the facilities were either taken down by the employer, or union personnel were forbidden from posting any information on them. *Id.,* at 24. According to DeBruin, the lack of access to the bulletin boards "seriously limited" the union's ability to communicate regularly with its members in the various facilities. *Id.,* at 28.

In addition to the removal of bulletin boards, Beverly also curtailed access to union representatives after the expiration of the CBAs. Under previous agreements, union staff were permitted to contact members during the work day and meet with them in break rooms. After the agreements expired, union access to employees was barred unless the administrator of a particular facility approved the meeting beforehand. Dkt. no. 77, at 30. In some cases, police were called to have the union representative removed from the facility. *Id.*

In some facilities, union personnel were instructed not to talk about the union, and not to wear union buttons and insignia. Dkt. no. 77, at 50–51. This anti-union message from management also took the form of conspicuous records-keeping of certain concerted union activities at some facilities. Some union members who participated in activities such as informational picketing observed either management personnel recording the names of participants or security personnel filming the participants engaged in the activity. Dkt. no. 77, at 51–52. These efforts by management had a chilling effect on union members and discouraged full employee participation. *Id.,* at 53.

Union strength at the facilities was also affected by the gradual return to work of many of the employees who engaged in the April 1, 1996 strike. This return to work at varying hours and different positions affected the union's efforts to effectively bargain with Beverly in two ways. First, with employees returning to different jobs and shifts, the union had to reestablish its leadership at each facility, as well as its communication network. The disruption of the normal union communication channels made it difficult to dispatch information, and to determine whether information was actually received by those for whom it was intended. Dkt. No. 77, at 88. Second, because employees wanted to talk only about "the replacement issue,"

considerable time had to be devoted to that issue alone, to the exclusion of other concerns. *Id.*, at 89–90.

Union stability was also dealt a serious blow by the filing of six decertification petitions. Petitions were filed to decertify the unions at Haida Manor, Richland Manor, Mt. Lebanon Manor, Fayette Health Care Center, William Penn Nursing Center and Clarion Care Center. Pl. Exh. 26. Significantly, Haida Manor, Richland Manor, William Penn Nursing Center, and Fayette Health Care Center are facilities where employees have a low turnover rate and above-average seniority. Richland Manor and Fayette have historically shown strong union support. Dkt. no. 78, at 149–53.

The evidence also supports a conclusion that, to some extent, participation in certain union activities has declined. Dkt. no. 77, at 111, Pl. Exh. 29. Many of the union employees who actively participated in the April 1, 1996 strike have voiced their refusal to participate in a strike again. Dkt. no. 77, at 111.

The record is replete with various forms of pro-union literature. But this plethora of informational fliers and bulletins intended for union members is not a reliable indicator of the unions' strength. All that it demonstrates is the considerable effort exerted to maintain a positive outlook in the wake of the strike and during the pendency of the unfair labor practice proceedings. In fact, much of the written material was generated by an additional union operative who was brought on board specifically to assist in bolstering union support and activity. Dkt. no. 78, at 212.

### III. *Standard for Issuance of Relief under § 10(j)*

■ The temporary relief available under § 10(j) [2] requires a determination by the district court of "whether there is 'reasonable cause' to believe that an unfair labor practice has occurred and whether an injunction would be 'just and proper.'" *Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874, 877 (3d Cir.1990) (citing *Kobell v. Suburban Lines*, 731 F.2d 1076, 1088–89 (3d Cir.1984)). The reasonable cause inquiry in a § 10(j) proceeding necessitates a determination as to whether there is a substantial, nonfrivolous legal theory and whether the facts construed in the light most favorable to the Board constitute sufficient evidence to support the asserted legal theory. 904 F.2d at 882 (citing 731 F.2d at 1084).

The Board's legal theory that Beverly has committed unfair labor practices prior to the April 1, 1996 strike is substantial and nonfrivolous because Beverly's conduct, if proven, would violate express statutory provisions precluding an employer from interfering with, restraining or coercing an employee in the exercise of his right to engage in concerted activity, 29 U.S.C. § 158(a)(1). I have already determined that the Board's legal theory that the April 1, 1996 strike complied with the notice requirements of § 158(g) was substantial and nonfrivolous. Dkt. no. 67. Accordingly, I need only determine if there are sufficient facts in the record to support the Board's legal theory and if equitable relief is "just and proper."

### IV. *Factual Inquiry of Reasonable Cause Prong*

■ The Board asserts that the evidence of record is more than enough to establish that there were unfair labor practices occurring at the various facilities and that the strikers were engaging in protected activity under the NLRA. During the arguments of counsel presented at the conclusion of the evidentiary hearing, I inquired whether this dispute boiled down to a question of whether relief would be "just and proper." Dkt. no. 80, at 480. Beverly's counsel replied: "I think predominantly so." *Id.* Counsel for Beverly also conceded during his closing ar-

**2.** Section 10(j) of the National Labor Relations Act (NLRA) provides in relevant part:

> (j) The Board shall have power, upon issuance of a complaint ... charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, ... for appropriate temporary relief or restraining order. Upon the filing of any such petition the court ... shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

gument that the evidence suggesting that the April, 1996 strike was a strike in protest of alleged unfair labor practices was strong. *Id.* Finally, he conceded that he could not argue to the contrary when asked, by this court, if the evidence met the "pretty easy" test. Dkt. no. 80, at 482.

Beverly now contends in its Post–Hearing Brief that it "does not concede reasonable cause to believe the strike was an unfair practice strike." Dkt. no. 85, at 11. Beverly submits that "[a]lthough the union attempted to create the appearance that the strike was to protest alleged unfair labor practices, the evidence suggests that the unions' efforts were an elaborate pretext designed to avoid the consequences of an economic strike driven by bargaining considerations." *Id.,*

Beverly's position fails to recognize that the Board need not prove that a violation occurred. As the Third Circuit instructs, such a determination is for the Board in the first instance. *Hirsch v. Building & Const. Trades Council, Etc.,* 530 F.2d 298, 302 (3d Cir.1976). The Board's burden of proof before the district court is "relatively insubstantial." 731 F.2d at 1084 (citing *Hirsch,* 530 F.2d at 302). The only question before me on this issue is whether some evidence is present demonstrating the elements of an unfair labor practice. 530 F.2d at 302. In determining whether there is sufficient evidence to support the Board's legal theory, the district court must accord considerable deference to the Board on the facts. 904 F.2d at 882.

Based on this standard and the evidence of record, and viewed most favorably to the Board, I conclude that the Board has met its relatively insubstantial burden of presenting evidence that would support not only the elements of the unfair labor practices prior to the strike, but also that the strike was in protest of the alleged unfair labor practices.

## V. *"Just and Proper" Prong*

The standard to be applied by a district court in determining whether temporary relief pursuant to § 10(j) is "just and proper" is less than clear. 731 F.2d at 1089. The Third Circuit has instructed that such a determination must be informed by the policies

underlying § 10(j). *Eisenberg v. Lenape Products, Inc.,* 781 F.2d 999, 1003 (3d Cir. 1986); *Suburban Lines,* 731 F.2d at 1090–91. "Congress sought to ensure that the Board would be able to exercise effectively its ultimate remedial power." *Lenape Products,* 781 F.2d at 1003. As a result, § 10(j) "was designed to enable the Labor Board to vindicate its ultimate remedial power by affording limited interim relief in instances where the passage of time reasonably necessary to adjudicate the case on its merits convinced the Board and the federal courts that the failure to grant such relief might dissipate the effective exercise of such power." 731 F.2d at 1091. The focus, therefore, is not upon the "egregiousness of the unfair labor practice ... but on the *unusual* likelihood ... of ultimate remedial failure." *Id.,* n. 26 (emphasis in original).

A consideration of the policies underlying § 10(j) necessitates a recognition of "the public interest implicit in protecting the collective bargaining process...." 904 F.2d at 879. This is so because the purpose of § 10(j) is not to vindicate the interests of those employees who have allegedly been harmed by the unfair labor practices at issue, but to act in the public's interest. *Id.,* at 876; *Eisenberg v. Wellington Hall Nursing Home,* 651 F.2d 902, 906–07 (3d Cir.1981); Senate Report no. 105, 80th Cong., 1st Sess. 8, 27 (1947). "The public interest at stake is the 'promot[ion of] wholesome and mutually acceptable labor relations and the settlement of labor disputes through collective bargaining between employees and their employer.'" 904 F.2d at 876 (quoting *Eisenberg v. Hartz Mountain Corp.,* 519 F.2d 138, 142 (3d Cir. 1975)).

■ In applying these principles, a district court "should discuss and determine whether the failure to grant interim injunctive relief would be likely to prevent the Board, acting with reasonable expedition, from effectively exercising its ultimate remedial powers." 731 F.2d at 1091–92. Hence, "the *critical determination* is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiation will be *impaired.*" 904 F.2d at 879 (emphasis added).

The degree of impairment that must be present to warrant injunctive relief under § 10(j) is not spelled out in the case law. But the analysis underlying a determination of whether granting § 10(j) relief is appropriate begins with a consideration of the nature of the alleged unfair labor practices and their impact upon the collective bargaining process. 904 F.2d at 878. This factual inquiry focuses upon "the likelihood of harm to the bargaining process in the interim." *Wellington Hall,* 651 F.2d at 907. "Unless there are circumstances, like the size, intimacy, and longevity of the bargaining unit, which indicate that the bargaining process will not be harmed, courts must be deferential to the Board's determination that the integrity of the process needs interim protection." 904 F.2d at 879 n. 7.

 The "likelihood of harm to the bargaining process" means that it is reasonable to expect under the facts of the case that there will be some adverse impact upon the process as a result of alleged unfair labor practices. *Hartz Mountain,* 519 F.2d at 142 (judicial action warranted under § 10(j) must be determined on a case by case basis). For example, in *Wellington Hall,* 651 F.2d at 907, the court found that the discharge of eight employees in a small bargaining unit would in "all likelihood" undermine union support at a critical stage of the bargaining process. So too, in *Pascarell,* 904 F.2d at 880, the court reversed the district court's denial of interim relief finding that the discharge of four members of the bargaining committee of a recently certified union would jeopardize the union's ability to remain stalwart during the pendency of the administrative proceedings. Accordingly, the interim relief available under § 10(j) is not limited to those instances where the collective bargaining process will be completely frustrated or defeated by the alleged unfair labor practices.

Third Circuit jurisprudence nonetheless cautions that the remedial relief available under § 10(j) is not always appropriate. If the harm from the alleged unfair labor practices, while theoretically damaging to the collective bargaining process, is in reality either of minimal consequence or outweighed by the resulting harm to the integrity of existing labor agreements, interim relief should be denied. For example, in *Suburban Lines,* 731 F.2d at 1076, the court recognized that § 10(j) relief may not be proper if the alleged unfair labor practice is against an established, "small and intimate" bargaining unit. In such a case, "if the alleged retaliation is against an established, 'small and intimate' bargaining unit, improper attempts by management to impair the collective bargaining process will have *minimal* 'chilling' effect because the employees will, most likely, be fully aware of their rights under the NLRA." 904 F.2d at 879 (citing 731 F.2d at 1093) (emphasis added). In *Lenape Products,* 781 F.2d at 999, the harm to the bargaining process was illusory because management was unaware of the organizational efforts of the employees and the discharge of certain individuals could not be interpreted by the employees as retaliation against union activity. *See also* 904 F.2d at 880 discussing *Lenape Products.*

In *Hartz Mountain,* 519 F.2d at 138, a § 10(j) injunction was reversed because the injunction actually did more harm than good to the collective bargaining process. There, the unfair labor practice was filed by a rejected union after the employer subsequently recognized another union. The injunction restrained the employer from giving effect to the existing collective bargaining agreement which provided health and welfare benefits for the employees. The circuit court recognized that the temporary relief issued by the district court served to protect the rejected union against possible further erosion of employee support and insure that the competition between the labor unions would be fair. Nevertheless, it reversed the injunction, reasoning that the more important public interest was to insure the functioning of the existing collective bargaining agreement and the provision of the benefits it guaranteed. 519 F.2d at 142.

Beverly contends that this court should apply traditional equitable considerations in ruling upon the Board's request for § 10(j) injunctive relief, and follow the lead of several sister circuits that have abandoned the reasonable cause/just and proper inquiry. *See Pye v. Sullivan Bros.,* 38 F.3d 58 (1st

Cir.1994); *Miller v. California Pac. Medical Center*, 19 F.3d 449, 458 (9th Cir.1994) (en banc); and *Kinney v. Pioneer Press*, 881 F.2d 485 (7th Cir.1989). My reading of Third Circuit authority fails to reveal any inclination to abandon the reasonable cause/just and proper inquiry. In *Suburban Lines*, 731 F.2d at 1078, the court specifically noted that interim relief under § 10(j) may be granted "without the showing of irreparable harm and a likelihood of success on the merits, which are the ordinary requisites...." Judge Aldisert's concurrence in *Suburban Lines* confirms that the Third Circuit's analysis of the just and proper prong in a § 10(j) proceeding is distinguishable "from a request for a mine-run preliminary injunction [in] that the Regional Director, as the plaintiff, has a rather low threshold to meet his or her burden of proof" 731 F.2d at 1095. As a district court, I am not free to follow the lead of other courts of appeal when their jurisprudence on a point is at variance with Third Circuit decisions. Because I conclude that the reasonable cause/just and proper inquiry is alive and well in this circuit, I decline Beverly's invitation to replace it with traditional equity principles.

## VI. *Application of the Just and Proper Prong*

■ As noted above, the "critical determination is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiation will be impaired." 904 F.2d at 879. I am satisfied that there is sufficient evidence to demonstrate that, without the issuance of an injunction, the Board's ultimate remedial powers may be frustrated. That, I conclude, constitutes the requisite impairment.

Beverly's alleged unfair labor practices have been selectively geared to destroy or at least impede the communication network among union members. By removing the bulletin boards and returning employees to different jobs and different shifts, Beverly has forced the union to recompose its infrastructure at each facility. Beverly's actions have prolonged the amount of time necessary to disseminate information, and have tended to demoralize the union ranks and impede whatever collective bargaining has occurred.

The weakening of the communication network has had a substantial impact upon the morale of the union members. The pendency of six decertification petitions is persuasive evidence of this. The decertification petitions are significant because they have been filed at some of the nursing facilities with considerable longevity among employees and with traditionally strong union support. If decertification proceeds, the Board's ability to remedy any unfair labor practices may be completely undermined simply due to the nonunion status of these former union strongholds.

Accordingly, I conclude that interim relief under § 10(j) should be granted.

## VII. *Single-Employer*

The Board seeks a blanket injunction against all twenty Beverly nursing homes named in this suit. The Board asserts that such relief is appropriate because these twenty nursing home facilities constitute a "single-employer" under the Act. Dkt. no. 82, at 27. The Board submits that application of the single-employer theory to several entities in a § 10(j) injunction proceeding has been upheld by the Third Circuit. *See Eisenberg v. Holland Rantos Co.*, 583 F.2d 100 (3d Cir.1978). Beverly contends that a blanket injunction should not issue because the "'single employer' doctrine applies in situations where two entities are performing the same function, but one has a collective bargaining relationship and the other does not." Dkt. no. 85, at 53. Beverly points out that there is no separate unrepresented entity in this case.

■ A "single employer" "exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.'" *NLRB v. Browning–Ferris Industries*, 691 F.2d 1117, 1122 (3d Cir.1982). This doctrine "is relevant to the determination that 'separate corporations are not what they appear to be, that in truth they are but divisions or departments of a single enterprise.'" *Id.* The determination of whether

two or more business entities are sufficiently integrated to warrant unitary treatment requires consideration of four factors: (1) functional integration of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership. *Id.*

■ One of the strongest indicators that the twenty nursing facilities are a single employer was Beverly's inclusion of each of the twenty nursing facilities as a party plaintiff in the Johnstown civil action initiated in an effort to stop the strike which commenced on April 1, 1996. *See Beverly Enterprises— Pennsylvania, Inc., et. al. v. District 1199P, Service Employees International Union, AFL–CIO et. al.,* Civil Action no. 96–64J. Beverly owns each of the twenty facilities and Wayne Chapman, Beverly's vice-president of operations for the central and eastern part of Pennsylvania and New Jersey, has total operational responsibility for these facilities. Dkt. no. 79, at 261–62. Mr. Chapman also had a hand in the contract negotiations for each of these facilities. Dkt. no. 79, at 267–68. Once the contracts at these twenty facilities expired, Mr. Chapman issued certain communications to the various facilities regarding the necessity of observing specific provisions in the expired contracts. *See* pl. exh. 2, 32.

These facts support the Board's assertion that the twenty nursing facilities constitute a single employer. The facilities, though managed separately at each site, are integrated in their overall management and labor relations. Their common ownership serves as a cohesive force in presenting a unitary opponent to the unions. I conclude that treatment of Beverly as a single employer is appropriate to achieve and enforce the remedial relief warranted under § 10(j).

VIII. *Appropriate Interim Relief*

■ Where interim relief is appropriate under § 10(j), the relief that is granted should be based on a case by case determination of "what judicial action will be in the public interest." 731 F.2d at 1096 (J. Aldisert concurring) (citing *Hartz Mountain,* 519 F.2d at 142). Only that relief "reasonably necessary to preserve the ultimate remedial power of the Board" should be granted; § 10(j) should not become the normal method for resolving labor disputes. 731 F.2d at 1091. Furthermore, any injunctive relief warranted under § 10(j) "should include an explicit time limitation, not longer than six months, on the restraint it imposes." *Hartz Mountain,* 519 F.2d at 144.

As indicated in section VI, relief is appropriate in light of the damage to the union's communication network at the various facilities. The most effective way of restoring that communication network is to reinstate the employees in the positions they held prior to the April 1, 1996 strike, and to return the bulletin boards at each facility.

■ Although the reinstatement of these employees is likely to be disruptive for Beverly, it should be no more disruptive than the original replacement of these workers after the strike. Third Circuit law instructs that "concern about protecting the employer from the harm from an injunction in the employee reinstatement context" is misplaced. *Eisenberg,* 651 F.2d at 906. The appropriate focus is upon "the likelihood of harm to the bargaining process in the interim" *Id.,* at 907. In the absence of full reinstatement, the communication network of the unions at some of the facilities may be nonexistent when final adjudication by the Board is issued. By that time, the remedial power of the Board would be exercised too late.

### *ORDER*

AND NOW, this 4th day of April, 1997, consistent with the foregoing Memorandum, it is hereby

ORDERED and DIRECTED that the Petition for Injunction Under § 10(j), docket no. 1, is GRANTED. Defendants, its officers, representatives, agents, servants and employees are directed to reinstate and maintain a bulletin board at each of the health care facilities for the use of the union personnel. Access to the union bulletin boards shall be made available forthwith, and in no event later than April 11, 1997. It is further ORDERED that defendants, its officers, representatives, agents, servants and employees shall offer full reinstatement to all

**418**

employees who engaged in the unfair labor practice strike which began on April 1, 1996, said reinstatement to be to their former positions of employment, including reinstatement to their former scheduled shifts, hours of work and work stations, or, if these former positions no longer exist, to substantially equivalent positions, displacing, if necessary, any employees hired to replace said employees. Reinstatement shall commence forthwith, and be completed within thirty (30) days, that is on or before May 5, 1997. It is further

ORDERED that this case shall remain on the docket of this Court and, on compliance by respondent with its obligations undertaken hereto and upon disposition of the matters pending before the Board, the Petitioner shall cause this proceeding to be dismissed.

This Order shall expire six months from the date of its issuance; provided however, that Petitioner may, upon motion, request a thirty (30) day extension of this Order if it appears that the decision of the Board's administrative law judge on the underlying unfair labor practice complaint in NLRB cases 6–CA–27873, et al., is imminent. Provided further, that after the issuance of said decision of the administrative law judge, upon motion of Petitioner, this Order may be extended, pending the Board's final decision, for an additional period not to exceed six months; provided further, that Petitioner may, upon motion, request an additional thirty (30) day extension of this Order if it appears that the final decision of the Board on the underlying unfair labor practice complaint is imminent.